**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHARRELL WILLIAMS, an individual;
CLIFFORD HARRIS, JR., an individual;
ROBIN THICKE, an individual, DBA I
Like'em Thicke Music,
  *Plaintiffs-Counter-Defendants-*
        *Appellants*,

and

MORE WATER FROM NAZARETH
PUBLISHING, INC.; STAR TRAK
ENTERTAINMENT; INTERSCOPE
RECORDS; UMG RECORDINGS, INC.;
UNIVERSAL MUSIC DISTRIBUTION,
  *Counter-Defendants-Appellants*,

v.

FRANKIE CHRISTIAN GAYE, an
individual; MARVIN GAYE III, an
individual; NONA MARVISA GAYE,
an individual,
  *Defendants-Counter-Claimants-*
         *Appellees.*

No. 15-56880

D.C. No.
2:13-cv-06004-
JAK-AGR

ORDER AND
AMENDED
OPINION

PHARRELL WILLIAMS, an individual;
CLIFFORD HARRIS, JR., an individual;
ROBIN THICKE, an individual, DBA I
Like'em Thicke Music,
    *Plaintiffs-Counter-Defendants-*
                    *Appellees*,

and

MORE WATER FROM NAZARETH
PUBLISHING, INC.; STAR TRAK
ENTERTAINMENT; INTERSCOPE
RECORDS; UMG RECORDINGS, INC.;
UNIVERSAL MUSIC DISTRIBUTION,
    *Counter-Defendants-Appellees*,

v.

FRANKIE CHRISTIAN GAYE, an
individual; MARVIN GAYE III, an
individual; NONA MARVISA GAYE,
an individual,
    *Defendants-Counter-Claimants-*
                    *Appellants.*

No. 16-55089

D.C. No.
2:13-cv-06004-
JAK-AGR

PHARRELL WILLIAMS, an individual;
ROBIN THICKE, an individual, DBA I
Like'em Thicke Music; CLIFFORD
HARRIS, JR., an individual,
    *Plaintiffs-Counter-Defendants-*
                *Appellees*,

and

MORE WATER FROM NAZARETH
PUBLISHING, INC.; STAR TRAK
ENTERTAINMENT; INTERSCOPE
RECORDS; UMG RECORDINGS, INC.;
UNIVERSAL MUSIC DISTRIBUTION,
    *Counter-Defendants-Appellees.*

v.

FRANKIE CHRISTIAN GAYE, an
individual; MARVIN GAYE III, an
individual; NONA MARVISA GAYE,
an individual,
    *Defendants-Counter-Claimants-*
                *Appellants*.

No. 16-55626

D.C. No.
2:13-cv-06004-
JAK-AGR

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted October 6, 2017
Pasadena, California

Filed March 21, 2018
Amended July 11, 2018

Before:  MILAN D. SMITH, JR., MARY H. MURGUIA,
and JACQUELINE H. NGUYEN, Circuit Judges.

Order;
Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Nguyen

## SUMMARY[*]

### Copyright

The panel filed (1) an order amending an opinion and
dissent and denying, on behalf of the court, a petition for
rehearing en banc; and (2) an amended opinion and dissent
in a copyright case.

In its amended opinion, the panel affirmed in part and
reversed in part the district court's judgment after a jury trial,
ruling that plaintiffs' song "Blurred Lines" infringed

---

[*] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

defendants' copyright in Marvin Gaye's song "Got To Give It Up."

The panel held that "Got To Give It Up" was entitled to broad copyright protection because musical compositions are not confined to a narrow range of expression. The panel accepted, without deciding, the merits of the district court's ruling that the scope of the defendants' copyright was limited, under the Copyright Act of 1909, to the sheet music deposited with the Copyright Office, and did not extend to sound recordings.

The panel held that the district court's order denying summary judgment was not reviewable after a full trial on the merits.

The panel held that the district court did not err in denying a new trial. The district court properly instructed the jury that there is no scienter requirement for copyright infringement and that it must find both access and substantial similarity. The district court did not erroneously instruct the jury to consider unprotectable elements of "Got To Give It Up." The district court did not abuse its discretion in admitting expert testimony. In addition, the verdict was not against the clear weight of the evidence because there was not an absolute absence of evidence of extrinsic and intrinsic similarity between the two songs.

The panel held that the district court's award of actual damages and infringers' profits and its running royalty were proper.

Reversing in part, the panel held that the district court erred in overturning the jury's general verdict in favor of certain parties because the defendants waived any challenge

to the consistency of the jury's general verdicts.  In addition, there was no duty to reconcile the verdicts.  The district court erred in finding one party secondarily liable for vicarious infringement.

The panel held that the district court did not abuse its discretion in denying the defendants' motion for attorneys' fees under § 505 of the Copyright Act or in apportioning costs among the parties.

Dissenting, Judge Nguyen wrote that "Blurred Lines" and "Got To Give It Up" were not objectively similar as a matter of law under the extrinsic test because they differed in melody, harmony, and rhythm, and the majority's refusal to compare the two works improperly allowed the defendants to copyright a musical style.

## COUNSEL

Kathleen M. Sullivan (argued) and Ellyde R. Thompson, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; Daniel C. Posner, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, California; Howard E. King, Stephen D. Rothschild, and Seth Miller, King Holmes Paterno & Soriano LLP, Los Angeles, California; for Plaintiffs-Appellants/Cross-Appellees Pharrell Williams, Clifford Harris Jr., Robin Thicke, and More Water from Nazareth Publishing Inc.

Mark E. Haddad (argued), Amanda R. Farfel, Michelle B. Goodman, Rollin A. Ransom, and Peter I. Ostroff, Sidley Austin LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees Star Trak Entertainment,

Interscope Records, UMG Recordings Inc., Universal Music Distribution.

Lisa Blatt (argued), Arnold & Porter LLP, Washington, D.C.; Richard S. Busch (argued), Sara R. Ellis, and Steven C. Douse, King & Ballow, Nashville, Tennessee; Daniel B. Asimow and Martin R. Glick, Arnold & Porter LLP, San Francisco, California; Paul H. Duvall, King & Ballow, Century City, California; Mark L. Block, Wargo & French LLP, Los Angeles, California; Paul N. Philips, Law Offices of Paul N. Philips APLC, Beverly Hills, California; for Defendants-Appellees/Cross-Appellants Frankie Christian Gaye, Marvin Gaye III, and Nona Marvisa Gaye.

Kenneth D. Freundlich, Freundlich Law, Encino, California, for Amici Curiae Musicologists.

Edwin F. McPherson, McPherson Rane LLP, Los Angeles, California, for Amici Curiae 212 Songwriters, Composers, Musicians, and Producers.

Charles Duan, Public Knowledge, Washington, D.C., for Amicus Curiae Public Knowledge.

Sean M. O'Connor, Lateef Mtima, and Steven D. Jamar, Institute for Intellectual Property and Social Justice Inc., Rockville, Maryland, for Amicus Curiae Institute for Intellectual Property and Social Justice; Musicians and Composers; and Law, Music, and Business Professors.

Bernard A. Burk, Director, Lawyering Skills Program, William H. Bowen School of Law, University of Arkansas at Little Rock, Little Rock, Arkansas; Howard Barry Abrams, University of Detroit Mercy School of Law, Detroit, Michigan; for Amici Curiae Musicologists.

Eugene Volokh, Mayer Brown LLP, Los Angeles, California; Erich C. Carey and Danielle M. Aguirre, National Music Publishers' Association, Washington, D.C.; for Amici Curiae Recording Industry Association of America and National Music Publishers' Association.

## ORDER

The opinion and dissent filed March 21, 2018, and reported at 885 F.3d 1150, are hereby amended. The amended opinion and dissent will be filed concurrently with this order.

Judges M. Smith and Murguia voted to deny the petition for rehearing en banc. Judge Nguyen voted to grant it. The full court has been advised of the petition for rehearing en banc, and no judge requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc, filed April 11, 2018, is DENIED.

No further petitions for panel rehearing or rehearing en banc will be entertained in this case.

**OPINION**

M. SMITH, Circuit Judge:

After a seven-day trial and two days of deliberation, a jury found that Pharrell Williams, Robin Thicke, and Clifford Harris, Jr.'s song "Blurred Lines," the world's best-selling single in 2013, infringed Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III's copyright in Marvin Gaye's 1977 hit song "Got To Give It Up." Three consolidated appeals followed.

Appellants and Cross-Appellees Williams, Thicke, Harris, and More Water from Nazareth Publishing, Inc. (collectively, Thicke Parties) appeal from the district court's judgment. They urge us to reverse the district court's denial of their motion for summary judgment and direct the district court to enter judgment in their favor. In the alternative, they ask us to vacate the judgment and remand the case for a new trial, on grounds of instructional error, improper admission of expert testimony, and lack of evidence supporting the verdict. If a new trial is not ordered, they request that we reverse or vacate the jury's awards of actual damages and infringer's profits, and the district court's imposition of a running royalty. Finally, they seek reversal of the judgment against Harris, challenging the district court's decision to overturn the jury's general verdict finding in Harris's favor.

Appellants and Cross-Appellees Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC (collectively, Interscope Parties) appeal from the district court's judgment. They urge us to reverse the judgment against them, challenging the district court's decision to overturn the jury's general verdict finding in their favor.

Appellees and Cross-Appellants Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III (collectively, Gayes) appeal from the district court's order on attorney's fees and costs. They request that we vacate and remand for reconsideration the district court's denial of attorney's fees, and award them their costs in full. The Gayes also protectively cross-appeal the district court's ruling limiting the scope of the Gayes' compositional copyright to the four corners of the sheet music deposited with the United States Copyright Office. In the event a new trial is ordered, the Gayes urge us to hold that Marvin Gaye's studio recording of "Got To Give It Up," rather than the deposit copy, establishes the scope of the Gayes' copyright under the Copyright Act of 1909.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our law requires that we review this case, which proceeded to a full trial on the merits in the district court, under deferential standards of review. We accordingly decide this case on narrow grounds, and affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. "Got To Give It Up"

In 1976, Marvin Gaye recorded the song "Got To Give It Up" in his studio. "Got To Give It Up" reached number one on Billboard's Hot 100 chart in 1977, and remains popular today.

In 1977, Jobete Music Company, Inc. registered "Got To Give It Up" with the United States Copyright Office and deposited six pages of handwritten sheet music attributing the song's words and music to Marvin Gaye. Marvin Gaye did not write or fluently read sheet music, and did not

prepare the deposit copy. Instead, an unidentified transcriber notated the sheet music after Marvin Gaye recorded "Got To Give It Up."

The Gayes inherited the copyrights in Marvin Gaye's musical compositions.

### B. "Blurred Lines"

In June 2012, Pharrell Williams and Robin Thicke wrote and recorded "Blurred Lines." Clifford Harris, Jr., known popularly as T.I., separately wrote and recorded a rap verse for "Blurred Lines" that was added to the track seven months later. "Blurred Lines" was the best-selling single in the world in 2013.

Thicke, Williams, and Harris co-own the musical composition copyright in "Blurred Lines." Star Trak and Interscope Records co-own the sound recording of "Blurred Lines." Universal Music Distribution manufactured and distributed "Blurred Lines."

### C. The Action

The Gayes made an infringement demand on Williams and Thicke after hearing "Blurred Lines." Negotiations failed, prompting Williams, Thicke, and Harris to file suit for a declaratory judgment of non-infringement on August 15, 2013.

The Gayes counterclaimed against the Thicke Parties, alleging that "Blurred Lines" infringed their copyright in

"Got To Give It Up,"[1] and added the Interscope Parties as third-party defendants.

## D. The District Court's Denial of Summary Judgment

The district court denied Williams and Thicke's motion for summary judgment on October 30, 2014.

### 1. The District Court's Interpretation of the Copyright Act of 1909

The district court ruled that the Gayes' compositional copyright, which is governed by the Copyright Act of 1909, did not extend to the commercial sound recording of "Got To Give It Up," and protected only the sheet music deposited with the Copyright Office. The district court accordingly limited its review of the evidence to the deposit copy, and concluded there were genuine issues of material fact.

### 2. The Evidence

The Thicke Parties relied upon the opinion of musicologist Sandy Wilbur. The Gayes relied upon the opinions of Dr. Ingrid Monson, the Quincy Jones Professor of African American Music at Harvard University, and musicologist Judith Finell. The experts disagreed sharply in their opinions, which they articulated in lengthy reports.

---

[1] The Gayes asserted a second counterclaim alleging that Thicke's song "Love After War" infringed their copyright in Marvin Gaye's composition "After the Dance." The jury found against the Gayes on the second counterclaim, and judgment was entered against them. On appeal, the second counterclaim is relevant only to the issue of costs.

Finell opined that there is a "constellation" of eight similarities between "Got To Give It Up" and "Blurred Lines," consisting of the signature phrase, hooks,[2] hooks with backup vocals, "Theme X,"[3] backup hooks, bass melodies, keyboard parts, and unusual percussion choices.

Wilbur opined that there are no substantial similarities between the melodies, rhythms, harmonies, structures, and lyrics of "Blurred Lines" and "Got To Give It Up," and disputed each area of similarity Finell identified. The district court compared Finell's testimony with Wilbur's and, pursuant to the extrinsic test under copyright law, meticulously filtered out elements Wilbur opined were not in the deposit copy, such as the backup vocals, "Theme X," descending bass line, keyboard rhythms, and percussion parts.

The district court also filtered out several unprotectable similarities Dr. Monson identified, including the use of a cowbell, hand percussion, drum set parts, background vocals, and keyboard parts. After filtering out those elements, the district court considered Dr. Monson's analysis of harmonic and melodic similarities between the songs, and noted differences between Wilbur's and Dr. Monson's opinions.

After performing its analytical dissection, as part of the extrinsic test, the district court summarized the remaining areas of dispute in the case. The district court identified disputes regarding the similarity of the songs' signature

---

[2] According to Finell, the term "hook" refers to the most important and memorable melodic material of a piece of popular music.

[3] Finell named a repeated four-note backup vocal in "Got To Give It Up" as "Theme X."

phrases, hooks, bass lines, keyboard chords, harmonic structures, and vocal melodies. Concluding that genuine issues of material fact existed, the district court denied Williams and Thicke's motion for summary judgment.

### E.  Trial

The case proceeded to a seven-day trial. The district court ruled before trial that the Gayes could present sound recordings of "Got To Give It Up" edited to capture only elements reflected in the deposit copy. Consequently, the commercial sound recording of "Got To Give It Up" was not played at trial.

Williams and Thicke testified, each acknowledging inspiration from Marvin Gaye and access to "Got To Give It Up."

Finell testified that "Blurred Lines" and "Got To Give It Up" share many similarities, including the bass lines, keyboard parts, signature phrases, hooks, "Theme X," bass melodies, word painting, and the placement of the rap and "parlando" sections in the two songs. She opined that nearly every bar of "Blurred Lines" contains an element similar to "Got To Give It Up." Although the district court had filtered out "Theme X," the descending bass line, and the keyboard rhythms as unprotectable at summary judgment, Finell testified that those elements were in the deposit copy.

Dr. Monson played three audio-engineered "mash-ups" she created to show the melodic and harmonic compatibility between "Blurred Lines" and "Got To Give It Up." She testified that the two songs shared structural similarities on a sectional and phrasing level.

Wilbur opined that the two songs are not substantially similar and disputed Finell and Dr. Monson's opinions. Wilbur prepared and played a sound recording containing her rendition of the deposit copy of "Got To Give It Up."

Neither the Thicke Parties nor the Gayes made a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) before the case was submitted to the jury.

On March 10, 2015, after two days of deliberation, the jury returned mixed general verdicts.[4] The jury found that Williams, More Water from Nazareth Publishing,[5] and Thicke infringed the Gayes' copyright in "Got To Give It Up." In contrast, the jury found that Harris and the Interscope Parties were not liable for infringement. The jury awarded the Gayes $4 million in actual damages, $1,610,455.31 in infringer's profits from Williams and More Water from Nazareth Publishing, and $1,768,191.88 in infringer's profits from Thicke.

### F. The District Court's Order on Post-Trial Motions

The district court ruled on the parties' various post-trial motions in an omnibus order.

The Thicke Parties filed a motion for judgment as a matter of law, a new trial, or remittitur. The district court

---

[4] Although the verdict forms are captioned "Special Verdict," they are functionally general verdict forms. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003) ("If the jury announces only its ultimate conclusions, it returns an ordinary general verdict[.]").

[5] More Water From Nazareth Publishing, Inc. collects royalties on Williams' behalf.

denied the Thicke Parties' motion for judgment as a matter of law and motion for a new trial, but remitted the award of actual damages and the award of Williams' profits.

The Gayes filed three motions, seeking (1) a declaration that Harris and the Interscope Parties were liable for infringement; (2) injunctive relief or, in the alternative, ongoing royalties; and (3) prejudgment interest. The district court construed the Gayes' motion for declaratory relief as a post-trial motion for judgment as a matter of law, and granted the motion, overturning the jury's general verdicts in favor of Harris and the Interscope Parties. The district court denied the Gayes' request for injunctive relief, but awarded them a running royalty of 50% of future songwriter and publishing revenues from "Blurred Lines." The district court granted in part the Gayes' motion for prejudgment interest.

## G.  The Judgment and Order on Attorney's Fees and Costs

The district court entered judgment on December 2, 2015. The court awarded the Gayes $3,188,527.50 in actual damages, profits of $1,768,191.88 against Thicke and $357,630.96 against Williams and More Water from Nazareth Publishing, and a running royalty of 50% of future songwriter and publishing revenues received by Williams, Thicke, and Harris.

On April 12, 2016, the district court denied the Gayes' motion for attorney's fees and apportioned costs between the parties. The parties timely appealed.

## ANALYSIS

### I.  Governing Law

We begin by discussing the law applicable to this case.

### A.  Elements of a Copyright Infringement Claim

To prevail on a copyright infringement claim, a plaintiff must show that (1) he or she owns the copyright in the infringed work, and (2) the defendant copied protected elements of the copyrighted work.  *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004).  A copyright plaintiff may prove copying with circumstantial, rather than direct, evidence. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).  "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'"  *Id.* (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)).

We use a two-part test for substantial similarity: an extrinsic test and an intrinsic test.  *Swirsky*, 376 F.3d at 845. For a jury to find substantial similarity, there must be evidence on both the extrinsic and intrinsic tests.  *Id.* (citing *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003)).  A district court applies only the extrinsic test on a motion for summary judgment, as the intrinsic test is reserved exclusively for the trier of fact.  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010).

The extrinsic test is objective.  *Swirsky*, 376 F.3d at 845. It "considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Id.*  Application of "[t]he extrinsic test requires 'analytical dissection of a work and expert testimony.'"  *Id.* (quoting

*Three Boys Music*, 212 F.3d at 485).  An analytical dissection, in turn, "requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by "substantial similarity."'" *Id.* (quoting *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029, 1051 (C.D. Cal. 2001)).

The intrinsic test, on the other hand, is subjective.  *Three Boys Music*, 212 F.3d at 485.  It "asks 'whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.'"  *Id.* (quoting *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991)).

"Because the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work."[6]  *Swirsky*, 376 F.3d at 845.  Still, "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected."  *Id.* at 848; *see also Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection."); *Three Boys Music*, 212 F.3d at 485–86 (upholding jury's finding of substantial

---

[6] "Copyright protection subsists . . . in original works of authorship," including "musical works" and "any accompanying words," that are "fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  Generally speaking, copyright law does not protect ideas, but rather, protects the expression of ideas.  *See id.* § 102(b); *Rice*, 330 F.3d at 1174.  For example, elements of an original work of authorship may be unprotectable by reason of the *scenes a faire* doctrine.  *See Swirsky*, 376 F.3d at 849–50.  According to that doctrine, "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright."  *Id.* at 850.

similarity based on "a combination of unprotectible elements"). This principle finds particular relevance in application of the intrinsic test, as a trier of fact may "find that the over-all impact and effect indicate substantial appropriation," even if "any one similarity taken by itself seems trivial." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1169 (9th Cir. 1977) (quoting *Malkin v. Dubinsky*, 146 F. Supp. 111, 114 (S.D.N.Y. 1956)), *superseded in part on other grounds*, 17 U.S.C. § 504(b); *see also Three Boys Music*, 212 F.3d at 485.

**B. The Standard of Similarity for Musical Compositions**

We have distinguished between "broad" and "thin" copyright protection based on the "range of expression" involved. *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010). "If there's a wide range of expression . . . , then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work." *Id.* (citation omitted). On the other hand, "[i]f there's only a narrow range of expression . . . , then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id.* at 914 (citation omitted). To illustrate, there are a myriad of ways to make an "aliens-attack movie," but "there are only so many ways to paint a red bouncy ball on blank canvas." *Id.* at 913–14. Whereas the former deserves broad copyright protection, the latter merits only thin copyright protection. *See id.*

We reject the Thicke Parties' argument that the Gayes' copyright enjoys only thin protection. Musical compositions are not confined to a narrow range of expression.**[7]** *See Swirsky*, 376 F.3d at 849 (noting that "[m]usic . . . is not capable of ready classification into only five or six constituent elements," but "is comprised of a large array of elements"). They are unlike a page-shaped computer desktop icon, *see Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994), or a "glass-in-glass jellyfish sculpture," *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). Rather, as we have observed previously, "[m]usic . . . is not capable of ready classification into only five or six constituent elements," but is instead "comprised of a large array of elements, some combination of which is protectable by copyright." *Swirsky*, 376 F.3d at 849. As "[t]here is no one magical combination of . . . factors that will automatically substantiate a musical infringement suit," and as "each allegation of infringement will be unique," the extrinsic test is met, "[s]o long as the plaintiff can demonstrate, through expert testimony . . . , that the similarity was 'substantial' and to 'protected elements' of the copyrighted work." *Id.* We have applied the substantial similarity standard to musical infringement suits before, *see id.*; *Three Boys Music*, 212 F.3d at 485, and see no reason to deviate from that standard now. Therefore, the Gayes' copyright is not limited to only thin copyright protection, and the Gayes need not prove virtual identity to substantiate their infringement action.

---

**[7]** Even the de minimis exception, which renders insignificant copying inactionable, does not require a standard of similarity as exacting as virtual identity. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d

## C.  The Copyright Act of 1909

Marvin Gaye composed "Got To Give It Up" before January 1, 1978, the effective date of the Copyright Act of 1976.  Accordingly, the Copyright Act of 1909 governs the Gayes' compositional copyright.  *See Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 876 (9th Cir. 2005); *Dolman v. Agee*, 157 F.3d 708, 712 n.1 (9th Cir. 1998).

While the Copyright Act of 1976 protects "works of authorship" fixed in "sound recordings," 17 U.S.C. § 102, the 1909 Act did not protect sound recordings.  It is well settled that "[s]ound recordings and musical compositions are separate works with their own distinct copyrights."[8]  *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 877 (9th Cir. 2016) (quoting *Erickson v. Blake*, 839 F. Supp. 2d 1132, 1135 n.3 (D. Or. 2012)).  It remains unsettled, however, whether copyright protection for musical compositions under the 1909 Act extends only to the four corners of the sheet music deposited with the United States Copyright Office, or whether the commercial sound recordings of the compositions are admissible to shed light on the scope of the underlying copyright.  Here, the district court ruled that the

---

871, 878 (9th Cir. 2016) ("A 'use is de minimis only if the average audience would not recognize the appropriation.'" (quoting *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004))).

[8] 17 U.S.C. § 102(a)(2) protects "musical works," while § 102(a)(7) protects "sound recordings."  "'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds . . . , regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied."  17 U.S.C. § 101.

1909 Act protected only the deposit copy of "Got To Give It Up," and excluded the sound recording from consideration.

The Gayes cross-appeal the district court's interpretation of the 1909 Act only in the event the case is remanded for a new trial. The parties have staked out mutually exclusive positions. The Gayes assert that Marvin Gaye's studio recording may establish the scope of a compositional copyright, despite the 1909 Act's lack of protection for sound recordings. The Thicke Parties, on the other hand, elevate the deposit copy as the quintessential measure of the scope of copyright protection.[9] Nevertheless, because we do not remand the case for a new trial, we need not, and decline to, resolve this issue in this opinion. For purposes of this appeal, we accept, without deciding, the merits of the district court's ruling that the scope of the Gayes' copyright in "Got To Give It Up" is limited to the deposit copy.

---

[9] To our knowledge, the Thicke Parties' position had not found support in case law until the district court's ruling. *See Three Boys Music*, 212 F.3d at 486 (observing, in the context of subject matter jurisdiction, that "[a]lthough the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, our definition of a 'complete copy' is broad and deferential"); *see also* 17 U.S.C. § 704 (providing that the Register of Copyrights and the Librarian of Congress may destroy or otherwise dispose of original deposit copies if certain facsimile requirements are met); *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 982 (C.D. Cal. 2015) (observing that "[t]he Copyright Office no longer has the deposit copy" of the work at issue, which was registered in 1935); 2 Nimmer on Copyright § 7.17[A] (2017) (noting that "[t]he function of deposit is to provide the Library of Congress *via* the Copyright Office with copies and phonorecords of all works published within the United States," and that the argument "that deposit has a copyright as well as an archival function" is "attenuated by the fact that the Library of Congress need not add all deposited works to its collection" or "preserve those works which it does add to its collection").

## II. The District Court's Order Denying Summary Judgment is Not Reviewable After a Full Trial on the Merits.

The Thicke Parties seek review of the district court's order denying their motion for summary judgment, contending that the district court erred in its application of the extrinsic test for substantial similarity.

The order is not reviewable.  The Supreme Court has squarely answered the question: "May a party . . . appeal an order denying summary judgment after a full trial on the merits?  Our answer is no." *Ortiz v. Jordan*, 562 U.S. 180, 183–84 (2011).  An order denying summary judgment is "simply a step along the route to final judgment." *Id.* at 184.  "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Id.*

The Thicke Parties argue that we may nonetheless review the district court's denial of summary judgment for legal error.  We "generally do 'not review a denial of a summary judgment motion after a full trial on the merits.'" *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (quoting *Banuelos v. Constr. Laborers' Tr. Funds for S. Cal.*, 382 F.3d 897, 902 (9th Cir. 2004)).  We carved out an exception to this general rule in the past, concluding that we may review "denials of summary judgment motions where the district court made an error of law that, if not made, would have required the district court to grant the motion.'" *Id.* (quoting *Banuelos*, 743 F.3d at 902).

*Ortiz* calls into question the continuing viability of our exception.[10] In *Ortiz*, the Supreme Court declined to address the argument that "'purely legal' issues capable of resolution 'with reference only to undisputed facts'" are preserved for appellate review even after trial. 562 U.S. at 189. Read broadly, *Ortiz* does not foreclose review of denials of summary judgment after trial, so long as the issues presented are purely legal. But read narrowly, the Court's dicta does not endorse such an exception either.

We need not decide today whether our exception survives *Ortiz* unaltered. The Thicke Parties' arguments "hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'" *Id.* The district court's application of the extrinsic test of similarity was a factbound inquiry far afield from decisions resolving "disputes about the substance and clarity of pre-existing law." *Id.* The district court's ruling bears little resemblance to legal issues we have reviewed pursuant to our exception. *See, e.g.*, *Escriba*, 743 F.3d at 1243–45 (examining whether "the district court erred as a matter of law by entertaining [defendant's] 'legally impossible' theory of the case that [plaintiff] affirmatively declined to take FMLA leave"); *Banuelos*, 382 F.3d at 903 (examining whether "the district court erred as a matter of law when it concluded it could hear evidence outside the administrative record" in an ERISA case); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 906 (9th Cir. 1999) (reviewing the district court's ruling on claim preclusion). We accordingly conclude that *Ortiz* forecloses our review of the district court's denial of summary judgment.

---

[10] While *Escriba*, a 2014 decision, post-dates *Ortiz*, *Escriba* does not reference the Supreme Court's decision. *See* 743 F.3d at 1243.

## III.    The District Court Did Not Abuse its Discretion in Denying a New Trial.

We review the district court's denial of a motion for a new trial for abuse of discretion. *Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 728 (9th Cir. 2007)). We may reverse the denial of a new trial only if the district court "reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *Id.* (quoting *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010)). "The abuse of discretion standard requires us to uphold a district court's determination that falls within a broad range of permissible conclusions, provided the district court did not apply the law erroneously." *Id.* (quoting *Kode*, 596 F.3d at 612).

The Thicke Parties argue that a new trial is warranted on three grounds: (1) Jury Instructions 42 and 43 were erroneous; (2) the district court abused its discretion in admitting portions of Finell and Dr. Monson's testimony; and (3) the verdict is against the clear weight of the evidence. We disagree, and discuss each ground in turn.

### A.  Instructions 42 and 43 Were Not Erroneous.

We review de novo whether jury instructions state the law accurately, but review a district court's formulation of jury instructions for abuse of discretion. *Id.* at 1085 (citing *Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011)). "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005) (alteration in original) (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001)).

### 1. Jury Instruction 42

The Thicke Parties argue that Instruction 42 allowed the jury to place undue weight on Williams and Thicke's statements claiming inspiration from "Got To Give It Up" and Marvin Gaye. The district court instructed the jurors:

> In order to find that the Thicke Parties copied either or both of the Gaye Parties' songs, it is not necessary that you find that the Thicke Parties consciously or deliberately copied either or both of these songs. It is sufficient if you find that the Thicke Parties subconsciously copied either or both of the Gaye Parties' songs.

Because direct evidence is rare, copying is usually circumstantially proved by a combination of access and substantial similarity. *See Swirsky*, 376 F.3d at 844. As the Thicke Parties acknowledge, access may be "based on a theory of widespread dissemination and subconscious copying." *Three Boys Music*, 212 F.3d at 483. In short, there is no scienter requirement. *See id.* at 482–85. Instruction 42 stated as much.

The Thicke Parties argue that Instruction 42 was nonetheless inappropriate, because the issue of access was not at issue. Not so. The Thicke Parties take an unduly narrow view of Instruction 42 in isolation. The instructions as a whole make plain that a circumstantial case of copying requires not just access, but also substantial similarity. Instructions 28 and 41 provide that copying may be proven

by demonstrating access plus substantial similarity.[11] Instruction 43 further underscores that the Gayes "must show that there is both substantial 'extrinsic similarity' and substantial 'intrinsic similarity' as to that pair of works." Looking to the jury instructions as a whole, *see Dang*, 422 F.3d at 805, it is clear that the district court properly instructed the jury to find both access and substantial similarity.

In light of the foregoing, we conclude that the district court did not err in giving Jury Instruction 42.

### 2. Jury Instruction 43

The Thicke Parties argue that Instruction 43 erroneously instructed the jury to consider unprotectable elements. Specifically, they contend that the district court instructed the jury that it "must consider" elements that they contend are not present in the deposit copy: "Theme X," the

---

[11] Instruction 28 provides: "The Gaye Parties may show the Thicke Parties copied from the work by showing by a preponderance of the evidence that the Thicke Parties had access to the Gaye Parties' copyrighted work and that there are substantial similarities between the Thicke Parties' work and original elements of the Gaye Parties' work." That the instruction uses the permissive "may" presents no problem. It simply reflects the fact that the Gayes may, but are not required to, prove copying by way of a circumstantial theory, rather than a direct one.

Instruction 41 provides: "If you conclude that the Thicke Parties had access to either or both of the Gaye Parties' works before creating either or both of their works, you may consider that access in connection with determining whether there is substantial similarity between either or both pairs of works." Instruction 41's use of "may" is not problematic either. Instruction 41 merely reiterates that the Gayes may choose to prove infringement by using a circumstantial theory.

descending bass line, and keyboard parts.  Instruction 43
states, in pertinent part:

> Extrinsic similarity is shown when two works
> have a similarity of ideas and expression as
> measured by external, objective criteria. To
> make this determination, you must consider
> the elements of each of the works and decide
> if they are substantially similar.  This is not
> the same as "identical."  There has been
> testimony and evidence presented by both
> sides on this issue, including by expert
> witnesses, as to such matters as: (a) for "Got
> to Give It Up" and "Blurred Lines," the so-
> called "Signature Phrase," hook, "Theme X,"
> bass melodies, keyboard parts, word
> painting, lyrics, [and] rap v. parlando . . . .
> The Gaye Parties do not have to show that
> each of these individual elements is
> substantially similar, but rather that there is
> enough similarity between a work of the
> Gaye Parties and an allegedly infringing
> work of the Thicke Parties to comprise a
> substantial amount.

First, the Thicke Parties take the word "must" out of
context.  Instruction 43's use of the word "must" serves to
underline the extrinsic test's requirement that the jury
compare the objective elements of the works for substantial
similarity.

Second, Finell testified that "Theme X," the descending
bass line, and the keyboard parts are reflected in the deposit
copy, while Wilbur testified to the contrary.  The experts'
quarrel over what was in the deposit copy was a factual

dispute for the jury to decide.  Even if Instruction 43's inclusion of contested elements could have led the jury to believe that the elements were in the deposit copy, and to consider them as protectable elements for purposes of the substantial similarity analysis, we cannot view Instruction 43 in isolation.  In light of the jury instructions as a whole, we do not conclude that the district court's listing of elements in Instruction 43 prevented the jury from making a factual determination of what was in the deposit copy.

The instructions on whole make clear that the jury could consider only elements in the deposit copy.  Instruction 28 states that the Gayes bear "the burden of proving that the Thicke Parties copied original elements from the Gaye[s'] copyrighted work."  Instruction 35, in turn, defines the Gayes' copyrighted work.  Instruction 35 informed jurors that at the time the copyright in "Got To Give It Up" was registered, "only written music could be filed by a copyright owner with the Copyright Office as the deposit copy of the copyrighted work."  In contrast, "[r]ecordings of musical compositions could not be filed with the Copyright Office at that time."  The district court cautioned the jurors to distinguish between the commercial sound recording of "Got To Give It Up" and the deposit copy, noting that "although [a] sound recording[] of 'Got to Give It Up' . . . w[as] made and released commercially, th[e] particular recording[] [is] not at issue in this case, w[as] not produced into evidence, and w[as] not played for you during the trial."  What was at issue was "testimony from one or more witnesses from each side about what each thinks is shown on the deposit copy for each composition," as well as "recorded versions of each work that each side has prepared based on what each side contends is shown in the deposit copy that was filed with the Copyright Office."  In short, the district court instructed the

jurors that the deposit copy, not the commercial sound recording, was the copyrighted work in the case.

*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989), is not helpful to the Thicke Parties. In *Harper House*, we held that the district court erred in failing to give jury instructions that "adequately distinguish[ed] between protectable and unprotectable material." 889 F.2d at 207–08. The copyrighted works at issue in *Harper House* were organizers, which receive "extremely limited protection" and are "compilations consisting largely of uncopyrightable elements," such as "blank forms, common property, or utilitarian aspects." *Id.* at 205, 207–08.

Suffice to say, musical compositions are not like organizers, and this case is easily distinguishable. The jury never heard the commercial sound recording. Elements indisputably present only in the sound recording, such as the use of cowbell and party noises, were never played at trial. Had that been the case, the district court would have had to instruct the jury to distinguish between elements in the commercial recording and elements in the deposit copy. Instead, the jury heard sound clips edited to capture elements that the experts testified were in the deposit copy. The question of which expert to believe was properly confided to the jury.

The district court did not err in giving Instruction 43.

**B. The District Court Did Not Abuse its Discretion in Admitting Portions of Finell and Dr. Monson's Testimony.**

We review the district court's evidentiary rulings for abuse of discretion. *Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013). The Thicke Parties

contend that the district court abused its discretion in admitting portions of Finell and Dr. Monson's expert testimony, arguing that they based their testimony on unprotectable elements. We disagree.

### 1. Finell's Testimony

The Thicke Parties object only to three portions of Finell's testimony: her testimony regarding "Theme X," the descending bass line, and the keyboard parts. Finell testified that "Theme X," the descending bass line, and the keyboard rhythms were in the deposit copy.

Finell was cross-examined for four hours. During cross-examination, Finell conceded that the notes of "Theme X" were not written on the sheet music, and she was questioned about her testimony that the notes of "Theme X" were implied in the deposit copy. She also acknowledged that the bass melody she presented at trial differed from that notated in the deposit copy. She was impeached with her deposition testimony, in which she admitted that the rhythm of the keyboard parts in the sound recording of "Got To Give It Up" is not notated in the deposit copy.

Wilbur disputed her testimony, opining that "Theme X," the descending bass line, and the keyboard rhythms are not contained in the deposit copy. The dispute boiled down to a question of whose testimony to believe. Both experts referenced the sound recording.[12] Both experts agreed that

---

[12] Wilbur initially relied upon the commercial sound recording of "Got To Give It Up" to prepare her transcriptions. She continued to rely upon her transcriptions from the commercial sound recording, finding that they were substantially the same as the transcriptions prepared from the deposit copy.

sheet music requires interpretation.[13]  The question of whose interpretation of the deposit copy to credit was a question properly left for the jury to resolve.  *See Three Boys Music*, 212 F.3d at 485–86 ("We refuse to interfere with the jury's credibility determination[.]").  Therefore, the district court did not abuse its discretion by permitting Finell's testimony.

## 2.  Dr. Monson's Testimony

The Thicke Parties argue that the district court abused its discretion in allowing Dr. Monson to play audio "mash-ups" superimposing Marvin Gaye's vocals from "Got To Give It Up" onto the accompaniment in "Blurred Lines," and vice versa.  They argue that the "mash-ups" contained unprotectable elements, such as the keyboard parts, bass melodies, and Marvin Gaye's vocals.[14]

This argument faces the same hurdle as the Thicke Parties' objection to Finell's testimony.  Dr. Monson testified that there were structural similarities between the

---

[13] On cross-examination, Wilbur acknowledged that a lead sheet reflects a simplified version of a chord pattern in a composition, and that chord notation is merely representational.

Wilbur also acknowledged that she relied on her interpretation of what was contained within the lead sheet to create her recording of "Got To Give It Up."  She admitted that she made choices to deviate from the sheet music, and that her choices were informed by her musical training and knowledge.  For example, despite the sheet music's instruction to continue playing a bass line throughout the song, she chose not to do so in certain parts of the song, knowing that playing the bass line would clash with certain chords.

[14] Although the "mash-ups" used Marvin Gaye's vocals, the parties have not disputed whether Marvin Gaye's vocals were notated in the deposit copy.

two songs at a sectional level and at a phrasing level, and used the "mash-ups" to demonstrate the songs' shared harmonic and melodic compatibility. We have permitted similar expert testimony in the past. *Cf. Swirsky*, 376 F.3d at 845–47 (holding that district court erred in discounting expert's testimony regarding structural similarities between two choruses). Dr. Monson was cross-examined on her opinion, and the jury was free to weigh her testimony as it saw fit.

Our decision in *Three Boys Music* confirms that the district court acted within its discretion. *Three Boys Music* was a 1909 Act copyright infringement case in which the jury heard not only a rendition of the deposit copy, *see* 212 F.3d at 486, but the complete commercial sound recording of the copyrighted song. Although the sufficiency of the deposit copy arose in the context of subject matter jurisdiction in *Three Boys Music*, our treatment of the issue lends support for our present conclusion. In *Three Boys Music*, the defendants argued that there were "inaccuracies in the deposit copy." 212 F.3d at 486–87. While the plaintiffs' expert testified that "the song's essential elements" were in the deposit copy, the defendants argued that "the majority of the musical elements that were part of the infringement claim" were not in the deposit copy. *Id.* at 486. Despite the fact that the jury heard the complete sound recording, which differed from the deposit copy, we still upheld the jury's verdict finding for the plaintiffs.[15] *Id.* at 486–87.

---

[15] It appears that factfinders have listened to commercial sound recordings in other music copyright infringement cases governed by the 1909 Act. *See, e.g.*, *Repp v. Webber*, 892 F. Supp. 552, 558 (S.D.N.Y. 1995) ("Having listened to the two songs at issue, however, the Court

Here, the district court excluded the commercial sound recording of "Got To Give It Up" from trial, and vigilantly policed the admission of testimony throughout trial, repeatedly instructing counsel to ensure that the experts tethered their testimony to the sheet music. The district court did not abuse its discretion in admitting portions of the Gayes' experts' testimony.

### C. The Verdict Was Not Against the Clear Weight of the Evidence.

The Thicke Parties argue that the verdict is against the clear weight of the evidence, maintaining that there is no extrinsic or intrinsic similarity between the two songs.

We are bound by the "'limited nature of our appellate function' in reviewing the district court's denial of a motion for a new trial." *Lam*, 869 F.3d at 1084 (quoting *Kode*, 596 F.3d at 612). So long as "there was some 'reasonable basis' for the jury's verdict," we will not reverse the district court's denial of a motion for a new trial. *Id.* (quoting *Molski*, 481 F.3d at 729). "[W]here the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable." *Id.* (quoting *Kode*, 596 F.3d at 612). When that is the case, we reverse "only when there is an

---

cannot say as a matter of law that they do not share any substantial similarities."); *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.*, 420 F. Supp. 177, 180 (S.D.N.Y. 1976) (noting that the similarity between the songs "is perfectly obvious to the listener"), *aff'd sub nom. ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir. 1983); *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 398 (S.D.N.Y. 1952) ("We have suffered through the playing of the commercial recordings.").

*absolute absence of evidence* to support the jury's verdict." *Id.* (quoting *Kode*, 596 F.3d at 612). "It is not the courts' place to substitute our evaluations for those of the jurors." *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003). Of note, we are "reluctant to reverse jury verdicts in music cases" on appeal, "[g]iven the difficulty of proving access and substantial similarity."[16] *Three Boys Music*, 212 F.3d at 481.

The Thicke Parties face significant, if not unsurmountable, hurdles. First, we are generally reluctant to disturb the trier of fact's findings, and have made clear that "[w]e will not second-guess the jury's application of the intrinsic test." *Id.* at 485. Second, our review is necessarily deferential where, as here, the district court, in denying the Rule 59 motion, concluded that the verdict was not against the clear weight of the evidence. Finell testified that nearly every bar of "Blurred Lines" contains an area of similarity to "Got To Give It Up." Even setting aside the three elements that trouble the Thicke Parties ("Theme X," the bass line, and the keyboard parts), Finell and Dr. Monson testified to multiple other areas of extrinsic similarity, including the songs' signature phrases, hooks, bass melodies, word painting, the placement of the rap and "parlando" sections, and structural similarities on a sectional and phrasing level. Thus, we cannot say that there was an absolute absence of evidence supporting the jury's verdict.

---

[16] Our conclusion in *Three Boys Music* provides an example of the deference we must apply in reviewing the jury's verdict. Although that case presented "a weak case of access and a circumstantial case of substantial similarity," we held that "neither issue warrants reversal of the jury's verdict." 212 F.3d at 486.

We conclude that the district court did not abuse its discretion in denying the Thicke Parties' motion for a new trial.

## IV. The Awards of Actual Damages and Profits and the District Court's Running Royalty Were Proper.

### A. The Award of Damages Was Not Based on Undue Speculation.

We afford "great deference" to a jury's award of damages and will uphold the award "unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)). We will uphold an award of hypothetical-license damages "provided the amount is not based on 'undue speculation.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004)). "The touchstone for hypothetical-license damages is 'the range of [the license's] reasonable market value.'" *Id.* (alteration in original) (quoting *Polar Bear Prods., Inc.*, 384 F.3d at 709)).

Here, the jury awarded the Gayes actual damages in the amount of 50% of the publishing revenues for "Blurred Lines." The Thicke Parties ask us to vacate the award of $3,188,527.50 (remitted by the district court from the jury's original award of $4 million),[17] because it was based upon

---

[17] The district court concluded that it had erred in informing the jury that the publishing revenues amounted to $8 million, where the parties had stipulated that the publishing revenues totaled $6,377,055. Having determined that the jury applied a royalty rate of 50% to the publishing

an unduly speculative hypothetical license rate of 50%. We disagree.

The Gayes called Nancie Stern, an industry expert with over twenty years of experience in negotiating and assigning valuations for the use of portions of older musical compositions in new compositions. Stern has performed such valuations thousands of times. Major labels, as well as renowned artists, have retained her services. Few other people or businesses perform her line of work.

Stern testified that the prototypical negotiation centers on the percentage of the new musical composition that the owner of the older composition should receive for the use. The industry standard assigns 50% for the music and 50% for the lyrics. Turning to the two songs at hand, Stern opined that the value of the use of "Got To Give It Up" in "Blurred Lines" would have been 50% had the Thicke Parties sought a license pre-release. Had the Thicke Parties sought a license post-release, the valuation would range between 75% to 100% percent. Stern arrived at her conclusion by reviewing "snippets" of the two songs and "A-B'ing" them, or playing them back and forth.[18] Stern's methodology and opinion were not unduly speculative, but tethered to her deep industry expertise.

In an attempt to buttress their position, the Thicke Parties cite to two decisions which are distinguishable. In *Oracle*,

---

revenues, the district court remitted the damages award from $4 million to $3,188,527.50, which is 50% of $6,377,055.

[18] Although the Thicke Parties contend that Stern impermissibly based her testimony on the sound recording of "Got To Give It Up," Stern testified that her opinion was based solely on the edited clips approved for trial.

we held the jury's award of $1.3 billion in hypothetical-license damages to be unduly speculative because "the evidence presented at trial failed to provide 'the range of the reasonable market value'" underlying the actual damages award. 765 F.3d at 1089 (quoting *Polar Bear Prods., Inc.*, 384 F.3d at 709)). Oracle's evidence was based on projected benefits and costs, and Oracle lacked a history of granting comparable licenses and provided no evidence of "benchmark" licenses in the industry. *See id.* at 1091–93. "Although a copyright plaintiff need not demonstrate that it would have reached a licensing agreement with the infringer or present evidence of 'benchmark' agreements in order to recover hypothetical-license damages," we observed that "it may be difficult for a plaintiff to establish the amount of such damages without undue speculation in the absence of such evidence." *Id.* at 1093.

Here, as in *Oracle*, there is no evidence of a prior benchmark license agreement between the Thicke Parties and the Gayes. However, in contrast to *Oracle*, the Gayes tethered their hypothetical license damages to evidence of a benchmark license in the industry. Instead of relying on undue speculation, the Gayes presented an expert who had extensive and specialized knowledge regarding the type of hypothetical license at issue. Stern opined, based on an industry standard and her evaluation of the songs involved, that the reasonable market value of a license would range between 50% pre-release and 75% to 100% post-release.

In *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), the Federal Circuit held that the "25 percent rule of thumb," used in patent cases "to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation," is a "fundamentally

flawed tool." 632 F.3d at 1312, 1315. The Federal Circuit observed that the 25% rule is "an abstract and largely theoretical construct" that "does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party." *Id.* at 1317. The 50% standard Stern identified does not extend without bounds across art forms or different copyrightable media in the same way the 25% rule of thumb applied without regard to the industry or technology involved. Stern's opinion was not based on abstraction, but on an industry standard and her expert assessment of the two songs. Her testimony was not unduly speculative, and did not render the damages award improper.

## B. The Award of Profits Is Not Clearly Erroneous.

We review an apportionment of infringer's profits for clear error. *Cream Records, Inc. v. Joseph Schlitz Brewing Co.*, 864 F.2d 668, 669 (9th Cir. 1989) (per curiam); *see also Three Boys Music*, 212 F.3d at 487 (upholding jury's apportionment of profits for lack of clear error). The burden is on the defendant to prove what percentage of its profits is not attributable to infringement. *Three Boys Music*, 212 F.3d at 487.

The Thicke Parties contend that the award of $1,768,191.88 in profits against Thicke and $357,630.96 (remitted by the district court from the jury's original award of $1,610,455.31) against Williams, which amounted to approximately 40% of their non-publishing profits from "Blurred Lines," is excessive. They assert that the evidence supports a profits award of only 5%, citing Wilbur's opinion that less than 5% of "Blurred Lines" contains elements allegedly similar to ones in "Got To Give It Up."

We affirmed a similar profits award in *Three Boys Music*. *See id.* In *Three Boys Music*, the defendant presented evidence that only 10% to 15% of profits were attributable to the song's infringing elements. *Id.* Despite the evidence, the jury attributed 66% of profits to the song's infringing elements. *Id.* Here, the Thicke Parties bore the burden of proof. The jury was free to accept Wilbur's testimony or instead credit Finell's testimony that nearly every measure of "Blurred Lines" contains an element similar to "Got To Give It Up." The jury's choice to "apportion[] less than 100% of the profits but more than the percentage estimates of [the Thicke Parties'] expert[] does not represent clear error." *Id.*

**C. The District Court Did Not Abuse its Discretion in Awarding the Gayes a Running Royalty at the Rate of 50%.**

We review a district court's decision to award equitable relief for abuse of discretion. *Traxler v. Multnomah County*, 596 F.3d 1007, 1014 n.4 (9th Cir. 2010); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (reviewing district court's imposition of an ongoing royalty for abuse of discretion). Findings of fact are reviewed for clear error. *See Traxler*, 596 F.3d at 1014 n.4.

The district court based the royalty rate on Stern's testimony. For the same reasons set forth above, *see supra* Part VI.A, we conclude that the district court did not abuse its discretion in awarding the Gayes a running royalty at the rate of 50%.

**V. The District Court Erred in Overturning the Jury's General Verdict in Favor of Harris and the Interscope Parties.**

We review de novo a district court's grant of judgment as a matter of law. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). We also review de novo a trial judge's decision to disrupt a jury verdict on the basis that an erroneous instruction resulted in inconsistent verdicts. *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997).

Harris and the Interscope Parties contend that the district court erred in overturning the jury's general verdicts finding in their favor. We agree. First, the Gayes waived any challenge to the consistency of the jury's general verdicts. Second, even had the Gayes preserved their challenge, neither Federal Rule of Civil Procedure 50(b) nor our decisions in *Westinghouse*, 106 F.3d 894, and *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005), conferred authority on the district court to upset the jury's verdicts in this case. Third, as to Harris specifically, the district court erred for the additional reason that no evidence showed Harris was vicariously liable.

## A. The Gayes Waived Any Challenge to the Consistency of the Jury's General Verdicts.

A party "waive[s] its objection to the jury's verdict . . . by not objecting to the alleged inconsistency prior to the dismissal of the jury." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995); *see also Kode*, 596 F.3d at 611 (recognizing waiver where "the moving party argues that the jury has rendered a verdict that contains two legal conclusions that are inconsistent with one another, and the moving party does not object before jury discharge"); *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984) (holding that a party "waived its right to object to the verdict by failing to object when the verdict was read"). The Gayes did not object to the

jury's verdicts prior to jury discharge.  Nor did they object during a colloquy with the district court after the jury was discharged.  They thus waived their challenge to any perceived inconsistencies between the jury's general verdicts.[19]

### B. The Gayes' Failure to Make a Motion Under Federal Rule of Civil Procedure 50(a) Precluded Relief Under Rule 50(b).

"Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  The Gayes did not make a Rule 50(a) motion.  Because "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law," *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009), Rule 50(b) did not authorize the district court to overturn the jury's general verdicts and adjudge Harris and the Interscope Parties liable as a matter of law.[20]

### C. *Westinghouse* and *El-Hakem* Do Not Apply.

The district court relied on two of our decisions to overturn the jury's general verdicts: *Westinghouse*, 106 F.3d 894, and *El-Hakem*, 415 F.3d 1068.  Neither decision applies in this case.

In *Westinghouse*, we affirmed a district court's decision to reconcile inconsistent general verdicts resulting from an

---

[19] The Gayes have not addressed the issue of waiver on appeal.

[20] There is one safety valve for what is otherwise a "harsh" rule: "Rule 50(b) 'may be satisfied by an ambiguous or inartfully made

erroneous jury instruction. *See* 106 F.3d at 902. There, the culprit was an erroneous instruction which added an extra element to an affirmative defense. *Id.* at 898. We held that where "it is possible to examine the pattern of jury verdicts and logically determine what facts a rational juror must have found in order to reach those verdicts," and the error is traceable to an erroneous jury instruction, the district court may "apply the correct law to these implicit factual findings and thereby . . . remedy the harm from the erroneous jury instruction without the expense and delay of a new trial." *Id.* at 902.

However, *Westinghouse* involved a "seemingly rare situation." *Id.* The *Westinghouse* exception to letting inconsistent general verdicts stand applies sparingly. "[I]n most cases where a jury renders inconsistent verdicts, the trial judge must allow those verdicts to stand because 'it is unclear whose ox has been gored.'" *Id.* at 903 (quoting *United States v. Powell*, 469 U.S. 57, 65 (1984)). District courts may "reconcile the verdicts without intruding upon the jury's fact-finding role" only under "very limited circumstances," where "there is an identifiable error that only could have affected one of the verdicts," "where the necessary factual findings can be determined from the pattern of verdicts," and where there is "nothing to [be] gain[ed] from a new trial." *Id.* at 902.

---

motion' under Rule 50(a).'" *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)). The Gayes briefly argue that a colloquy between their counsel and the district court regarding jury instructions and verdict forms qualifies as an "ambiguous or inartfully made" Rule 50(a) motion. The colloquy falls far short of the standard for a Rule 50(a) exception based on an "ambiguous or inartfully made" motion.

Those rare circumstances are not present in this case. The district court concluded that its instructions on distribution liability were inadequate, and that with clearer instructions, the jury would necessarily have found the Interscope Parties and Harris liable for distributing the infringing work. However, the instructions did not contain any error on par with the unmistakably erroneous instruction in *Westinghouse*.

Next, *El-Hakem* does not authorize the reconciliation of inconsistent general verdicts. It is clear that our holding in *El-Hakem* stemmed from law specific to special verdicts.**[21]** Indeed, we observed that "[w]hen confronted by seemingly inconsistent responses to special verdict interrogatories, a trial court has a *duty* to harmonize those responses whenever possible." *El-Hakem*, 415 F.3d at 1074 (emphasis added). In contrast, there is no duty to reconcile inconsistent general verdicts. We have held, in accordance with the majority rule, that "legally inconsistent verdicts 'may nonetheless stand on appeal even though inconsistent.'" *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003) (quoting *Int'l Longshoremen's & Warehousemen's Union (CIO) v. Hawaiian Pineapple Co.*, 226 F.2d 875, 881 (9th Cir. 1955)). We see no reason to deviate from this rule today.

---

**[21]** It is true, as the Gayes observe, that while we classified the verdicts in *El-Hakem* as special verdicts, they were functionally general verdicts. *See El-Hakem v. BJY Inc.*, 262 F. Supp. 2d 1139, 1146 (D. Or. 2003), *aff'd*, 415 F.3d 1068 (9th Cir. 2005). Notwithstanding this fact, *El-Hakem* is distinguishable for the reasons above, and for the additional reason that the parties in *El-Hakem*, unlike the parties in this case, moved for judgment as a matter of law. 415 F.3d at 1072.

**D.  Harris Is Not Vicariously Liable.**

The district court erred in entering judgment against Harris for the additional reason that the Gayes proffered no evidence establishing that Harris was secondarily liable for vicarious infringement.  The Gayes argue, without citing to the record or to any law, that Harris is liable as a matter of law as a co-owner of the copyright who authorized the distribution of "Blurred Lines."[22]  They are incorrect both legally and factually.

To be vicariously liable for copyright infringement, one must have "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007).  A vicarious infringer "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).

No evidence was adduced at trial supporting a theory of vicarious liability.  Harris, who did not testify at trial, independently wrote and recorded a rap verse that was added to the track seven months after Thicke and Williams created "Blurred Lines."  Neither Thicke nor Williams expected the later addition of a rap verse or had anything to do with its creation.  The Gayes have cited nothing in the record

---

[22] The parties' stipulation that Harris co-owned 13% of the musical composition copyright in "Blurred Lines" sheds no light on Harris's role in the distribution process.

demonstrating that Harris had either a right to stop the infringing conduct or the ability to do so, much less both.

We conclude that the district court erred in upsetting the jury's general verdicts in favor of Harris and the Interscope Parties and entering judgment against them.

## VI. The District Court Did Not Abuse its Discretion in Denying the Gayes' Motion for Attorney's Fees.

We review a district court's decision on attorney's fees for abuse of discretion. *Stetson v. Grissom*, 821 F.3d 1157, 1163 (9th Cir. 2016).

The Gayes request that we vacate the district court's order denying their motion for attorney's fees and remand the case for reconsideration in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016). In *Kirtsaeng*, the Supreme Court reaffirmed the principle that, in exercising its authority under § 505 of the Copyright Act to award a prevailing party attorney's fees, a court "should give substantial weight to the objective reasonableness of the losing party's position." *Id.* at 1983. The Court cautioned, however, that "the court must also give due consideration to all other circumstances relevant to granting fees; and it retains discretion, in light of those factors, to make an award even when the losing party advanced a reasonable claim or defense." *Id.*

Here, the district court's examination of objective reasonableness was but one factor in its analysis. The district court took the specific circumstances of the case into consideration, including the degree of success obtained, the purposes of the Copyright Act, the chilling effect of attorney's fees, motivation, frivolousness, factual and legal unreasonableness, compensation, and deterrence. The

district court did not abuse its discretion in denying the Gayes' motion for attorney's fees, and a remand on that issue is not warranted.

## VII.   The District Court Did Not Abuse its Discretion in Apportioning Costs Among the Parties.

We review the district court's award of costs for abuse of discretion. *Draper v. Rosario*, 836 F.3d 1072, 1087 (9th Cir. 2016).

Federal Rule of Civil Procedure 54(d)(1) authorizes the award of costs "to the prevailing party." A "party in whose favor judgment is rendered is generally the prevailing party for purposes of awarding costs under Rule 54(d)." *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 741 (9th Cir. 2009) (quoting *d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886, 896 (9th Cir. 1977)). Here, the district court entered judgment for the Gayes on their claim that "Blurred Lines" infringed their copyright in "Got To Give It Up," but entered judgment for the Thicke Parties on the Gayes' claim that "Love After War" infringed their copyright in "After the Dance." The district court apportioned the award of costs accordingly, awarding the Gayes their costs for the "Blurred Lines" claim, and awarding the Thicke Parties their costs for the "Love After War" claim.

The Gayes urge us to adopt the Federal Circuit's holding that "there can only be one prevailing party in a given case" for purposes of Rule 54(d)(1). *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). Despite the Federal Circuit's singular construction of "the prevailing party," it affirmed an award of costs functionally equivalent to the one the district court ordered in this case. *See id.* at 1364. The Federal Circuit held that "the district court did not abuse its

discretion in awarding costs to each party with respect to the claims on which they each prevailed, then netting those sums to arrive at the final figure." *Id.* Here, as in *Shum*, the district court in effect reduced the Gayes' costs award "to reflect the extent of [their] victory." *Id.* at 1370. This was not an abuse of discretion.**[23]**

### VIII.  You Can't Get There from Here: The Dissent Ignores Governing Law that We Must Apply Given the Procedural Posture of the Case.

The dissent's position violates every controlling procedural rule involved in this case. The dissent improperly tries, after a full jury trial has concluded, to act as judge, jury, and executioner, but there is no there there, and the attempt fails.

Two barriers block entry of judgment as a matter of law for the Thicke Parties. The dissent attempts to sidestep these obstacles: It finds that the Thicke Parties are entitled to judgment as a matter of law, but fails to explain the procedural mechanism by which this could be achieved. Given this flawed premise, it is perhaps unsurprising how little the dissent mirrors the majority opinion, and how far it

---

**[23]** Additional authorities support our conclusion. *See In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 469 (3d Cir. 2000) ("The general rule in this circuit and others is that a district court, in exercising its equitable discretion, may apportion costs between the prevailing and non-prevailing parties as it sees fit."); *Amarel v. Connell*, 102 F.3d 1494, 1524 (9th Cir. 1997) (instructing the district court to "await the outcome of the [Sherman Act] Section 1 claim to ascertain whether allocation of costs is necessary," rather than "attempting to award partial costs at this juncture," where defendants prevailed on the Section 2 claim, but we remanded the Section 1 claim for a new trial).

veers into analysis untethered from the procedural posture of this case.

First, the dissent incorrectly concludes that there are no procedural obstacles barring entry of judgment as a matter of law for the Thicke Parties. The dissent is unable to distinguish the Supreme Court's decision in *Ortiz*, which prevents us from reviewing the district court's order denying summary judgment after a full trial on the merits. 562 U.S. at 183–84. Even assuming our court's limited exception for reviewing a denial of summary judgment for legal error, *see Escriba*, 743 F.3d at 1243, survives *Ortiz* without change, we reiterate, without recapitulating our earlier analysis, *supra* Part II, that the dissent's attempt to distinguish *Ortiz* and latch onto the exception outlined in *Escriba* is futile in this case. This case "hardly present[s] 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'" *Ortiz*, 562 U.S. at 189. Even though the dissent's musicological exegesis has no bearing on our analysis at this procedural stage of the case, it clearly shows that the facts in this case are hotly disputed and that the case does not just involve pure issues of law. The dissent cites no controlling law authorizing it to undertake its own summary judgment analysis at this stage of the case.

Second, the Thicke Parties, like the Gayes, failed to make a Rule 50(a) motion for judgment as a matter of law at trial. Their failure to do so "precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Tortu*, 556 F.3d at 1083.[24] Just as the district court could not enter

---

[24] Even in a case where the defendant argued that the district court "induced him not to file [a] Rule 50(a) motion," we nonetheless adhered to the strict requirements of Rule 50, noting that the defendant still "could have filed a Rule 50(a) motion . . . before the matter had been

judgment as a matter of law for the Thicke Parties, we cannot do so either.

This procedural limitation is well worth underscoring. We held, in a case in which a party made an oral Rule 50(a) motion, but failed to renew its motion, that the party "waived its challenge to the sufficiency of the evidence because it did not renew its pre-verdict Rule 50(a) motion by filing a post-verdict Rule 50(b) motion." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). We further held that, under the Supreme Court's decision in *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), the party's failure to renew a Rule 50(a) motion "precluded [us] from exercising our discretion to engage in plain error review." *Nitco*, 491 F.3d at 1089–90. We thus overruled our "prior decisions permit[ing] a discretionary plain error review" in the absence of a Rule 50(a) motion "as in conflict with controlling Supreme Court authority." *Id.* (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). Thus, when we stitch together Rule 50's requirements with our case law, we are left with this result: Because "a post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence," *id.* at 1089, and because a Rule 50(a) motion is, in turn, a prerequisite for a Rule 50(b) motion, *see Tortu*, 556 F.3d at 1081–83, an advocate's failure to comply with Rule 50's requirements gives us serious pause, and compels us to heighten the level of deference we apply on appeal.

---

submitted to the jury," and holding that the defendant's "disregard[]" of Rule 50's "clear requirements" foreclosed the possibility of relief pursuant to Rule 50(b). *Tortu*, 556 F.3d at 1083. Here, the Thicke Parties could—and should—have filed a Rule 50(a) motion in order to preserve their ability to make a Rule 50(b) motion, regardless of whether or not the district court would have granted the motion.

The dissent cites *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986), for the proposition that "reviewing a summary judgment ruling and a jury verdict" are two sides of the same coin. The dissent makes an important omission, however. The Supreme Court observed that the standard of review for a *directed verdict* motion resembles that for a motion for summary judgment:

> [T]he "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted."

*Id.* (quoting *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983)). As neither of the parties made a motion for a directed verdict, we lack a procedural mechanism for resurrecting a summary judgment-stage analysis. As we have emphasized repeatedly, our review on appeal is necessarily circumscribed.

The dissent cites a number of cases it claims support the proposition that a court must award judgment as a matter of law when it is able to determine substantial similarity, or lack thereof, under the extrinsic test. None of the cases the dissent cites, however, authorizes us to review a factbound summary judgment denial after a full trial on the merits, or to enter judgment as a matter of law in the absence of a Rule 50(a) motion below. All of the cases cited in the dissent arise from a different procedural posture, and are clearly distinguishable. *See Rentmeester v. Nike, Inc.*, 883 F.3d

1111, 1116 (9th Cir. 2018) (reviewing grant of motion to dismiss); *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 773 (9th Cir. 2018) (reviewing grant of summary judgment); *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1065 (9th Cir. 2016) (reviewing grant of judgment as a matter of law); *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012) (reviewing grant of motion to dismiss); *Mattel*, 616 F.3d at 912–13, 918 (vacating equitable relief awarded by district court on other grounds, where the district court had "made its *own* infringement findings in determining whether Mattel was entitled to equitable relief" (emphasis added)); *Benay*, 607 F.3d at 622 (reviewing grant of summary judgment); *Newton v. Diamond*, 388 F.3d 1189, 1190 (9th Cir. 2004) (reviewing grant of summary judgment); *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002) (per curiam) (reviewing grant of summary judgment). Moreover, to the extent the citations to unpublished dispositions in the dissent carry any weight, which we question, they, too, provide no support for what the dissent seeks to accomplish. *See Briggs v. Sony Pictures Entm't, Inc.*, 714 F. App'x 712, 713 (9th Cir. 2018) (reviewing grant of summary judgment); *Silas v. Home Box Office, Inc.*, 713 F. App'x 626, 627 (9th Cir. 2018) (reviewing grant of motion to dismiss); *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620 (9th Cir. 2017) (reviewing grant of motion to dismiss); *Edwards v. Cinelou Films*, 696 F. App'x 270, 270 (9th Cir. 2017) (reviewing grant of motion to dismiss); *Heusey v. Emmerich*, 692 F. App'x 928, 928–29 (9th Cir. 2017) (reviewing grant of motion to dismiss); *Braddock v. Jolie*, 691 F. App'x 318, 319 (9th Cir. 2017) (reviewing grant of motion for judgment on the pleadings); *Basile v. Twentieth Century Fox Film Corp.*, 678 F. App'x 576, 576 (9th Cir. 2017) (reviewing grant of motion to dismiss).

The dissent's remaining alternative to entering judgment as a matter of law for the Thicke Parties is to vacate the judgment and remand for a new trial. Although the dissent does not state so expressly, it appears that the dissent would reverse the district court's denial of the Thicke Parties' motion for a new trial on grounds that the verdict is against the clear weight of the evidence.

Assuming, *arguendo*, that is the route the dissent wishes to pursue, it nevertheless runs into several hurdles. Critically, there is no reference to the deferential standard of review applicable to the district court's denial of the Thicke Parties' motion for a new trial. Indeed, there is no discussion of the district court's denial of the motion for a new trial at all. It bears repeating, then, that we are bound by the "'limited nature of our appellate function' in reviewing the district court's denial of a motion for a new trial." *Lam*, 869 F.3d at 1084 (quoting *Kode*, 596 F.3d at 612). As is the case here, "where the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable." *Id.* (quoting *Kode*, 596 F.3d at 612). Under these circumstances, "only . . . an *absolute absence of evidence* to support the jury's verdict" will result in reversal. *Id.* (quoting *Kode*, 596 F.3d at 612). "Although the trial judge can weigh the evidence and assess the credibility of witnesses, we may not." *Kode*, 596 F.3d at 612; *see also Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) ("[W]e cannot weigh the evidence for ourselves . . . .").

In a thorough order, the district court reviewed the evidence presented at trial, and concluded that the verdict was not against the clear weight of the evidence. In faulting us for "tellingly refus[ing] to explain" the evidence

supporting the verdict, the dissent ignores the weighty restrictions on our review at this procedural stage of the case. The dissent jettisons the constraints on our review, instead opting for the radical route of playing both expert and juror. The dissent weighs the experts' credibility, resolves factual conflicts, and sets forth its own findings on the extrinsic test.[25]  We decline the dissent's invitation to invade the province of the jury:  Applying the proper standard of review, one simply cannot say truthfully that there was an absolute absence of evidence supporting the jury's verdict in this case.

To buttress this point, in *Swirsky*, we reversed the district court's grant of summary judgment of non-infringement, finding the district court erred, in large part, by conducting an analysis similar to the one the dissent has undertaken here. *See* 376 F.3d at 846–49.  Two of our conclusions in *Swirsky* are particularly relevant here.  First, we held that the district court erred in discounting the expert's musical methodology on technical grounds. *See id.* at 846–47.  For example, the district court rejected the expert's "selective" choice to "discount[] notes that he characterize[d] as 'ornamental,'" and discredited the expert's opinion that, "even though measure three of both choruses were not identical in numerical pitch sequence or note selection," they emphasized the same scale degree and resolved similarly. *Id.*  We observed that "[t]here is nothing inherently unsound

---

[25] The dissent does not mention the fact that the jury also considered the intrinsic test in reaching its verdict.  The dissent correctly stops short of explicitly "second-guess[ing] the jury's application of the intrinsic test," *Three Boys Music*, 212 F.3d at 485, which is reserved exclusively for the trier of fact, *Benay*, 607 F.3d at 624.

about [the expert's] musicological methodology," *id.* at 846, and we similarly decline to conclude otherwise in this case.

Second, we held in *Swirsky* that the district court "erred by basing its comparison of the two choruses almost entirely on a measure-by-measure comparison of melodic note sequences from the full transcriptions of the choruses." *Id.* at 847. In so holding, we reiterated our case law. We stressed that "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Id.* at 848; *see also Three Boys Music*, 212 F.3d at 485 ("It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because '"the over-all impact and effect indicate substantial appropriation."'" (quoting *Krofft*, 562 F.2d at 1169)). In fact, "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Swirsky*, 376 F.3d at 852 (alteration in original) (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987)). Thus, even "an arrangement of a limited number of notes can garner copyright protection." *Id.* at 851. If taken to its logical conclusion, the dissent's musicological analysis and approach would sound the death knell for these governing legal principles.

Consider the principle that, at summary judgment, so long as the Gayes "presented '*indicia* of a sufficient disagreement concerning the substantial similarity of [the] two works,' then the case *must* be submitted to a trier of fact." *Id.* at 844 (alteration in original) (emphasis added) (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992)). To require that a case be submitted to a trier of fact if there is any "indicia" of a

disagreement regarding substantial similarity, only to impose on the district court the task of independently scrutinizing the expert testimony presented at trial, would turn our law on its head. Worse still, to require a district court to do so in the absence of a Rule 50 motion defies law and logic.

Moreover, the expert review conducted by the dissent does not provide a workable standard for district courts to follow. It is unrealistic to expect district courts to possess even a baseline fluency in musicology, much less to conduct an independent musicological analysis at a level as exacting as the one used by the dissent. After all, we require parties to present expert testimony in musical infringement cases for a reason. *See id.* at 845.

The dissent has failed to take into account another wrinkle that would ensue from vacating the judgment and remanding the case for a new trial. The Gayes have cross-appealed protectively, challenging the district court's interpretation of the 1909 Act, in the event a new trial is ordered. Even though a vacatur and remand would trigger the Gayes' protective cross-appeal, the dissent does not wrestle with the merits of this issue. While the dissent is adamant that the scope of the Gayes' copyright is limited to the four corners of the deposit copy, it provides no statutory interpretation or legal analysis supporting its assertion.

Lastly, the dissent prophesies that our decision will shake the foundations of copyright law, imperil the music industry, and stifle creativity. It even suggests that the Gayes' victory will come back to haunt them, as the Gayes' musical compositions may now be found to infringe any number of famous songs preceding them. Respectfully,

these conjectures are unfounded hyperbole.[26] Our decision does not grant license to copyright a musical style or "groove." Nor does it upset the balance Congress struck between the freedom of artistic expression, on the one hand, and copyright protection of the fruits of that expression, on the other hand. Rather, our decision hinges on settled procedural principles and the limited nature of our appellate review, dictated by the particular posture of this case and controlling copyright law. Far from heralding the end of musical creativity as we know it, our decision, even construed broadly, reads more accurately as a cautionary tale for future trial counsel wishing to maximize their odds of success.

## CONCLUSION

We have decided this case on narrow grounds. Our conclusions turn on the procedural posture of the case, which requires us to review the relevant issues under deferential standards of review. For the foregoing reasons, we reverse the district court's entry of judgment against Harris and the Interscope Parties, and affirm the remainder of the district court's judgment, and its order denying attorney's fees and apportioning costs.

The parties shall bear their own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART.

---

[26] Unlike the 1909 Act, the current copyright regime, established by the 1976 Act, protects "works of authorship" fixed in "sound recordings." 17 U.S.C. § 102. Despite the dissent's prediction that our decision will "strike[] a devastating blow to future musicians and composers everywhere," the reality is that, going forward, a number of the contentious issues presented in this case will occur with less frequency with the passage of time.

NGUYEN, Circuit Judge, dissenting:

The majority allows the Gayes to accomplish what no one has before: copyright a musical style. "Blurred Lines" and "Got to Give It Up" are not objectively similar. They differ in melody, harmony, and rhythm. Yet by refusing to compare the two works, the majority establishes a dangerous precedent that strikes a devastating blow to future musicians and composers everywhere.

While juries are entitled to rely on properly supported expert opinion in determining substantial similarity, experts must be able to articulate facts upon which their conclusions—and thus the jury's findings—logically rely. Here, the Gayes' expert, musicologist Judith Finell, cherry-picked brief snippets to opine that a "constellation" of individually unprotectable elements in both pieces of music made them substantially similar. That might be reasonable if the two constellations bore any resemblance. But Big and Little Dipper they are not. The only similarity between these "constellations" is that they're both compositions of stars.

## I.

When a court, with the assistance of expert testimony, is able to determine substantial similarity (or lack thereof) under the extrinsic test, judgment must be given as a matter of law. *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010). If, for example, the defendant copied verbatim most of the plaintiff's work, then the plaintiff is entitled to a finding of substantial similarity as a matter of law. *See Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002) ("[E]ven a casual comparison of the two compositions compels the conclusion that the two compositions are practically identical."). Conversely, if the objective similarities between the two pieces are merely

trivial, then a verdict for the plaintiff could not stand. *See Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012) (affirming dismissal of infringement suit where the two songs "share[d] only small cosmetic similarities"); *Newton v. Diamond ("Newton II")*, 388 F.3d 1189 (9th Cir. 2004) (affirming grant of summary judgment to defendants who appropriated a de minimis portion of the plaintiff's musical composition and used it throughout their own work).

The majority, like the district court, presents this case as a battle of the experts in which the jury simply credited one expert's factual assertions over another's. To the contrary, there were no material factual disputes at trial. Finell testified about certain similarities between the deposit copy of the "Got to Give It Up" lead sheet and "Blurred Lines." Pharrell Williams and Robin Thicke don't contest the existence of these similarities. Rather, they argue that these similarities are insufficient to support a finding of substantial similarity as a matter of law. The majority fails to engage with this argument.

Finell identified a few superficial similarities at the "cell" level by focusing on individual musical elements, such as rhythm or pitch, entirely out of context. Most of these "short . . . pattern[s]" weren't themselves protectable by copyright, and Finell ignored both the other elements with which they appeared and their overall placement in each of the songs. Her analysis is the equivalent of finding substantial similarity between two pointillist paintings because both have a few flecks of similarly colored paint. A comparison of the deposit copy of "Got to Give it Up" and "Blurred Lines" under the extrinsic test leads to only one conclusion. Williams and Thicke were entitled to judgment as a matter of law.

## II.

## A.

The purpose of copyright law is to ensure a robust public domain of creative works. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). While the Constitution authorizes Congress to grant authors monopoly privileges on the commercial exploitation of their output, *see* U.S. Const. art. I, § 8, cl. 8, this "special reward" is primarily designed to motivate authors' creative activity and thereby "allow the public access to the products of their genius." *Sony Corp.*, 464 U.S. at 429. Accordingly, copyrights are limited in both time and scope. *See* U.S. Const. art. I, § 8, cl. 8 (providing copyright protection only "for limited Times"); *Sony Corp.*, 464 U.S. at 432 ("This protection has never accorded the copyright owner complete control over all possible uses of his work."); *see also Berlin v. E.C. Publ'ns, Inc.*, 329 F.2d 541, 544 (2d Cir. 1964) ("[C]ourts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry.").

An important limitation on copyright protection is that it covers only an author's expression—as opposed to the idea underlying that expression. *See* 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated . . . ."); *id.* § 102(b) ("In no case does copyright protection . . . extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in [the author's original] work."). Copyright "encourages others to build freely upon

the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556–57 (1985)).

The idea/expression dichotomy, as this principle is known, "strikes a definitional balance between the First Amendment and the Copyright Act." *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1037 (9th Cir. 2015) (quoting *Harper & Row*, 471 U.S. at 556) (alteration in *Harper & Row* omitted). Because "some restriction on expression is the inherent and intended effect of every grant of copyright," *Golan v. Holder*, 565 U.S. 302, 327–28 (2012), the idea/expression dichotomy serves as one of copyright law's "built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (citing *Harper & Row*, 471 U.S., at 560).

Such accommodations are necessary because "in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845) (Story, J.)). Every work of art "borrows, and must necessarily borrow, and use much which was well known and used before." *Id.* (quoting *Emerson*, 8 F. Cas. at 619); *see* 1 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.05[B] (rev. ed. 2017) ("In the field of popular songs, many, if not most, compositions bear some similarity to prior songs.").[1] But for the freedom to borrow others'

---

[1] As an example, Williams and Thicke attempted to show the jury a video demonstrating how a common sequence of four chords serves as the harmonic backbone of innumerable songs. *See* Axis of Awesome, *4 Chord Song (with song titles)*, YouTube (Dec. 10, 2009)

ideas and express them in new ways, artists would simply cease producing new works—to society's great detriment.

**B.**

"Blurred Lines" clearly shares the same "groove" or musical genre as "Got to Give It Up," which everyone agrees is an unprotectable idea. *See, e.g.*, 2 William F. Patry, *Patry on Copyright* § 4:14 (2017) ("[T]here is no protection for a communal style . . . ."). But what the majority overlooks is that two works in the same genre must share at least some protectable expression in order to run afoul of copyright law.

Not all expression is protectable. Originality, the "*sine qua non* of copyright," accommodates authors' need to build on the works of others by requiring copyrightable expression to be "independently created by the author" and have "at least some minimal degree of creativity." *Feist*, 499 U.S. at 345, 348. If an author uses commonplace elements that are firmly rooted in the genre's tradition, the expression is unoriginal and thus uncopyrightable. *See id.* at 363.

Even original expression can be so intimately associated with the underlying idea as to be unprotectable. Under the doctrine of scènes à faire, "expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*,

---

https://www.youtube.com/watch?v=5pidokakU4I (singing 38 popular songs over the same chord progression, ranging from "Let It Be" by the Beatles to "If I Were a Boy" by Beyoncé). "Blurred Lines" employs only two chords—the first two from this sequence. The district court prevented the jury from hearing this evidence. However, the court allowed the jury to hear mashups of "Blurred Lines" played together with "Got to Give It Up," which the Gayes used to show that the two songs were harmonically similar.

323 F.3d 805, 810 (9th Cir. 2003) (citing *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983)). The doctrine of merger provides that "where an idea contained in an expression cannot be communicated in a wide variety of ways," the "idea and expression may merge . . . [such] that even verbatim reproduction of a factual work may not constitute infringement." *Allen v. Acad. Games League of Am., Inc.*, 89 F.3d 614, 617 (9th Cir. 1996); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) ("[S]imilarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994))).

The majority begins its analysis by suggesting that the Gayes enjoy broad copyright protection because, as a category, "[m]usical compositions are not confined to a narrow range of expression." Maj. Op. at 20. But the majority then contrasts this protected category as a whole with specific applications of other protected categories—the "page-shaped computer desktop icon" in *Apple Computer* (an audiovisual work) and the "glass-in-glass jellyfish sculpture" in *Satava* (a pictorial, graphic, and sculptural work)[2]—that were entitled only to thin copyright protection due to the limited number of ways in which they could be expressed. That's a false comparison. Under the majority's reasoning, the copyrights in the desktop icon and glass jellyfish should have been broad. Like musical

---

[2] The Copyright Act expressly protects each of these categories. *See* 17 U.S.C. § 102(a)(2) (musical works); *id.* § 102(a)(5) (pictorial, graphic, and sculptural works); *id.* § 102(a)(6) (motion pictures and other audiovisual works).

compositions, both audiovisual works and pictorial, graphic, and sculptural works can be expressed in myriad ways.

More importantly, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist*, 499 U.S. at 348. Application of the extrinsic test "requires breaking the [copyrighted and allegedly infringing] works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (internal quotation marks omitted). "Because the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material . . . ." *Id.* We then "apply the limiting doctrines, subtracting the unoriginal elements," to determine how "broad" or "thin" the remaining copyright is. *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (citing *Apple Computer*, 35 F.3d at 1442).

The majority doesn't explain what elements are protectable in "Got to Give It Up," which is surprising given that our review of this issue is de novo. *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010). But by affirming the jury's verdict, the majority implicitly draws the line between protectable and unprotectable expression "so broadly that future authors, composers and artists will find a diminished store of ideas on which to build their works." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1225 (11th Cir. 2008) (quoting *Meade v. United States*, 27 Fed. Cl. 367, 372 (Fed. Cl. 1992)).

The issue here isn't whether Williams and Thicke copied "Got to Give It Up"—there's plenty of evidence they were

attempting to evoke Marvin Gaye's style. Rather, the issue is whether they took too much.

Copying in and of itself "is not conclusive of infringement. Some copying is permitted." *Newton II*, 388 F.3d at 1193 (quoting *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y. 1909) (Hand, J.)). Copying will only have legal consequences if it "has been done to an unfair extent." *Id.* (quoting *West Publ'g*, 169 F. at 861). In determining liability for copyright infringement, the critical and ultimate inquiry is whether "the copying is substantial." *Id.*

Requiring similarities to be substantial is of heightened importance in cases involving musical compositions. Sound recordings have "unique performance elements" that must be "filter[ed] out . . . from consideration." *Newton II*, 388 F.3d at 1194. Thus, the range of musical expression is necessarily more circumscribed when music is written down than when it is performed. "Given the limited number of musical notes (as opposed to words in a language), the combination of those notes and their phrasing, it is not surprising that a simple composition of a short length might well be susceptible to original creation by more than one composer." *Calhoun*, 298 F.3d at 1232 (footnote omitted).

## III.

The Gayes don't contend that every aspect of "Blurred Lines" infringes "Got to Give It Up." Rather, they identify only a few features that are present in both works. These features, however, aren't individually protectable. And when considered in the works as a whole, these similarities aren't even perceptible, let alone substantial.

Musical compositions are expressed primarily through the building blocks of melody, harmony, and rhythm.[3] *See Newton v. Diamond ("Newton I")*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002) (citing 3 Nimmer & Nimmer, *supra*, § 2.05[D]); Randel, *supra*, at 481 ("The whole of music is often informally divided into three domains: melody, harmony, and rhythm."); *see generally* Aaron Copland, *What to Listen for in Music* 33–77 (McGraw-Hill 1957). The deposit copy of "Got to Give it Up" employs these components through a melodic line, an introductory bass line, and chord indications, with the additional feature of lyrics.

The melodic line and the associated lyrics are notated throughout the deposit copy. The bass line is notated for only the first eight measures,[4] at the end of which the phrase "bass simile" indicates that the bass line should continue in a similar manner. As is typical of a lead sheet, the chords

---

[3] Of course, these aren't the only elements through which a musical idea can be expressed in tangible form. *See Swirsky*, 376 F.3d at 848–49. Other elements include tempo (the speed at which a composition is played), dynamics (the volume of sound), and instrumentation. *See id.* Many elements can be broken down into constituent elements. For example, melody is a sequence of pitches played successively; harmony is a group of pitches played simultaneously; and a chord progression is a sequence of harmonies. *See* Don Michael Randel, *The New Harvard Dictionary of Music* 366, 481–82 (1986). The analysis will generally focus on the most relevant subset of elements, which depends on the nature of the music at issue. *See Swirsky*, 376 F.3d at 849. Finell did not compare the songs' overall harmonies because she felt "that wasn't the most important similarity."

[4] In musical notation, the notes signifying individual pitches are grouped into "measures" divided by vertical "bar" lines. Within a measure, the note immediately after the bar line, or "downbeat," receives the greatest emphasis.

are not expressed with individual notes indicating pitch and duration. Rather, the chords are described by name (*e.g.*, "A7" for a chord containing the pitches A, C#, E, and G) at places in the song where the harmony changes.

## A.  Alleged Melodic Similarities

### 1.  The "Signature" Phrase

Finell dubbed a 10-note melodic sequence in the deposit copy the "Signature Phrase."  She argued that it corresponded to a 12-note sequence in "Blurred Lines," notwithstanding that "no two notes have the same pitch, rhythm and placement," as the district court correctly observed.

Finell identified four similar elements, none of which is protectable: (a) each phrase begins with repeated notes; (b) the phrases have three identical pitches in a row in the first measure and two in the second measure; (c) each phrase begins with the same rhythm; and (d) each phrase ends on a melisma (one word sung over multiple pitches).



*Signature Phrase in "Got to Give It Up"*
*(Trial Exhibit 376-3)*



*Signature Phrase in "Blurred Lines"*
*(Trial Exhibit 376-3)*

### a.  Repeated Notes

The Signature Phrase begins in "Got to Give It Up" with a note repeated four times.  In "Blurred Lines," it begins with a note repeated twice, followed by a different note, followed by the first note.[5]  The use of repeating notes is obviously not original to "Got to Give It Up."  Finell repeatedly used the song "Happy Birthday to You" and the opening to Beethoven's Fifth Symphony as musical examples.  Each of these famous melodies from the nineteenth century begins with repeated notes.  Therefore, the use of repeated notes is not protectable.

### b.  Pitch Similarity

Although the Signature Phrase starts on different pitches in each piece, Finell identified three consecutive ascending pitches that were the same in both pieces, and two

---

[5] Finell attempted to minimize the significance of the third note in "Blurred Lines" moving to a neighboring pitch rather than repeating. However, she previously testified that the neighboring pitch—a sharp second scale degree (indicated "#2" in her exhibit)—was a "broken rule" that "stands out."  Thus, the most prominent note in the four-note sequence in "Blurred Lines" is the one that differs from the corresponding sequence in "Got to Give It Up."

consecutive descending pitches that were the same. She believed this similarity to be the most important.

In assessing the similarity of two pieces of music, it's important to keep in mind "the limited number of notes and chords available to composers and the resulting fact that common themes frequently reappear in various compositions, especially in popular music." *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988) (citing *Arnstein v. Edward B. Marks Music Corp.*, 82 F.2d 275, 277 (2d Cir. 1936)). Substantial similarity "must extend beyond themes that could have been derived from a common source or themes that are so trite as to be likely to reappear in many compositions." *Id.* at 1068–69 (citing *Selle v. Gibb*, 741 F.2d 896, 905 (7th Cir. 1984)).

Three consecutive pitches is just the sort of common theme that will recur in many compositions.[6] We have not yet addressed whether three pitches are protectable as a matter of law. While "a single musical note would be too small a unit to attract copyright protection . . . , an arrangement of a limited number of notes can garner copyright protection." *Swirsky*, 376 F.3d at 851. Thus, we

---

[6] There are only $12^3$ or 1,728 unique combinations of three notes, and many of them are unlikely to be used in a song. *See Darrell v. Joe Morris Music Co.*, 113 F.2d 80, 80 (2d Cir. 1940) (per curiam) ("[W]hile there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing; and much fewer still suit the infantile demands of the popular ear."). Finell testified that it's "unusual" to use the five notes that fall between the seven notes of the scale. Demand for unique three-note combinations would quickly exhaust their supply. In 2016 alone, the Copyright Office registered over 40,000 sound recordings. *See* United States Copyright Office, *Fiscal 2016 Annual Report* 17.

held in *Swirsky* that a melody of seven notes is not unprotectable as a matter of law. *Id.* at 852.

In *Newton II*, we considered a three-note musical phrase that the defendants sampled (*i.e.*, copied exactly) from the sound recording of a copyrighted musical composition and used repeatedly throughout their work. Although we did not decide whether this six-second segment was original enough to be protected, we held that "no reasonable juror could find [it] to be a quantitatively or qualitatively significant portion of the [four-and-a-half-minute] composition as a whole." *Newton II*, 388 F.3d at 1195. The district court reached the originality issue. In a "scholarly opinion," it ruled that the three-note phrase—even in combination with the background musical elements—was insufficiently original to warrant copyright protection. *Id.* at 1190; *see Newton I*, 204 F. Supp. 2d at 1253 ("Many courts have found that nearly identical or more substantial samples are not susceptible to copyright protection.").

The two- and three-note melodic snippets at issue here, taken in isolation from their harmonic context, are even less original than the three-note segment at issue in *Newton*. When played, each snippet lasts less than a second in a composition that lasts over four minutes. They are not individually protectable.

### c. Rhythmic Similarity

The first measure of the Signature Phrase in both works begins with a rhythm of six eighth notes. A bare rhythmic pattern, particularly one so short and common, isn't protectable. *See Batiste v. Najm*, 28 F. Supp. 3d 595, 616 (E.D. La. 2014) "[C]ourts have been consistent in finding rhythm to be unprotectable."); *N. Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 400 (S.D.N.Y. 1952)

("[O]riginality of rhythm is a rarity, if not an impossibility."); *see also Berlin*, 329 F.2d at 545 ("[W]e doubt that even so eminent a composer as plaintiff Irving Berlin should be permitted to claim a property interest in iambic pentameter."). Here, the rhythmic pattern lasts approximately 1.5 seconds and consists of an eighth note repeated without any variation. Similar patterns are found in numerous other works. This element, devoid of its melodic and harmonic context, lacks any originality.

## d. Melisma

The final syllable of the lyrics in each phrase spans multiple pitches—three in "Got to Give It Up" and two in "Blurred Lines." Melisma, however, is "a common musical technique" and, as such, unprotectable. *McDonald v. West*, 138 F. Supp. 3d 448, 458 (S.D.N.Y. 2015). Use of melisma on the final syllable of a lyrical phrase is particularly "basic and commonplace." *Id.* (involving melisma on the final syllable of "We made it in America"). For example, any time one sings "Happy Birthday" to a person with a one-syllable name, the person's name is sung as a two-note melisma at the end of the phrase "Happy Birthday, dear ____."

## e. The Signature Phrases as a Whole Are Not Substantially Similar

Even when each element is not individually protectable, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element," *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). Here, as Finell concedes, the Signature Phrase has "very few notes," lasting less than four seconds. Therefore, even assuming that the Signature Phrase as a whole is protectable, its protection is thin.

There is very little similarity between the two songs' Signature Phrases. Both melodies rise and fall. But they begin and end on different pitches. The highest, longest, most stressed pitch in each phrase is different—in "Blurred Lines," this pitch is consonant with the underlying harmony; in "Got to Give It Up," it is dissonant. One phrase has 10 notes; the other, 12. The five identical pitches in each of the phrases have different rhythmic placement within the measure and therefore receive different stress. And only two of these identical pitches have similar underlying harmonies.[7] The harmony changes halfway through the Signature Phrase in "Blurred Lines" but remains the same in "Got to Give It Up." The lyrics in each phrase are different. The Signature Phrase occurs in different places within each piece. In "Got to Give It Up," the Signature Phrase is the very first phrase sung. In "Blurred Lines," the Signature Phrase is not sung until 28 seconds later—after several lines of verse.

The various unprotected elements identified by Finell don't even coincide with one another in that short, four-second snippet. And her narrow focus on these elements ignored the different harmonies in each phrase. "To pull these elements out of a song individually, without also looking at them in combination, is to perform an incomplete

---

[7] In "Got to Give It Up," the entire Signature Phrase is harmonized to an A7 chord. In "Blurred Lines," the first measure is harmonized to an E chord while the second measure is harmonized to an A chord. Seventh chords, such as A7, have the same three pitches as their underlying triads—here, an A chord—plus an additional pitch. *See* Copland, *supra*, at 66–67. Finell explained that the unique pitch in a seventh chord "add[s] an extra color" to the harmony.

and distorted musicological analysis." *Swirsky*, 376 F.3d at 848.**[8]**

Given the lack of similarities between the Signature Phrases, there is no basis to conclude that they are substantially similar. "The most that can be said is that the two segments bear some relation to one another within a finite world of melodies. Given the limited musical vocabulary available to composers, this is far from enough to support an inference of [infringement]." *Johnson v. Gordon*, 409 F.3d 12, 22 (1st Cir. 2005).

## 2. The "Hook" Phrase

Finell describes the Hook Phrase as the four melodic pitches in "Got to Give It Up" sung to the lyrics "keep on dancin'." She opined that "Blurred Lines" has similar Hook Phrases in two different places: one is the four pitches in the Signature Phrase sung to the lyrics "take a good girl"; the

---

[8] The majority fundamentally misunderstands *Swirsky* on this point. *See* Maj. Op. at 54–55. *Swirsky* did not hold that two works sharing multiple unprotected elements in disparate places are extrinsically similar. Were that the case, the entire Western canon would be extrinsically similar, since all of this music contains the same twelve individually unprotected notes. The difference between *Swirsky* and this case is that in *Swirsky*, there was a coincidence of the unprotected elements (chord progressions, rhythm, and pitch sequence) within each song that occurred at the same relative place (the chorus) in both. *See Swirsky*, 376 F.3d at 848. Here, Finell examined the various elements in isolation, which is precisely what we criticized in *Swirsky*. *See* 376 F.3d at 848 ("[N]o approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key . . . .").

other is the five pitches sung to the lyrics "I hate these blurred lines."

There are basic conceptual problems with Finell's analysis. She describes the same four pitches in "Blurred Lines" as being similar to two unrelated phrases in "Got to Give It Up"—the Signature Phrase and the Hook Phrase. It is difficult to see how anything original in each of these two different phrases could be distilled into the same four-note phrase in "Blurred Lines."

In any event, the Hook Phrase in the deposit copy lacks sufficient originality to be protected. Its sequence of four pitches, lasting 2.5 seconds, is common. For example, Beyoncé, Jennifer Hudson, and Anika Noni Rose memorably sang it to the lyrics, "We're your dreamgirls." *See* Henry Krieger & Tom Eyen, *Dreamgirls* measures 25–26 (Universal—Geffin Music 1981).



*Hook Phrase in "Got to Give It Up"*



*Hook Phrase in "Blurred Lines"*



*Hook Phrase in "Dreamgirls"*

Even if the Hook Phrase pitches were protectable, there is no substantial similarity between its expression in the two songs. *See Arnstein v. Edward B. Marks Music Corp.*, 82 F.2d 275, 277 (2d Cir. 1936) (Hand, J.) ("The first phrase of the infringing chorus consists of the same four notes as the first phrase of the copyrighted song; that particular sequence can be found in several earlier musical pieces and its spontaneous reproduction should be no cause for suspicion.").

At most, three of the four pitches are the same,[9] and the different pitch is sung to what Finell described as the "money words" on "the strongest beat." The phrase's rhythms and underlying harmonies are different. Moreover, the phrases are sung at different places in each song. In "Got to Give It Up," the Hook Phrase is sung at the end of part 1 in a fade out. In "Blurred Lines," it is sung as the chorus in the middle of the song.

### 3. Theme "X"

Theme X refers to another four-note melodic sequence. In the deposit copy, Theme X is sung to the lyrics "Fancy lady." In "Blurred Lines," it is first sung to the lyrics "If you

---

[9] Finell cited two examples of the Hook Phrase in "Blurred Lines," but they share only the last two pitches of their four- and five-note sequences. These two shared pitches are both tonic notes, which Finell described as "very common" in melodies.

can't hear." Like the Hook Phrase, Theme X is both unprotectable and objectively dissimilar in the two songs.



*Theme X in "Got to Give It Up"*



*Theme X in "Blurred Lines"*



*Theme X in "Happy Birthday to You"*

The pitches and rhythm of Theme X in the deposit copy are identical to those sung to "Happy Birthday" and numerous other songs. None of the Theme X pitches in the deposit copy are the same as in "Blurred Lines." To see any correspondence between the two four-note sequences, one would have to shift and invert the pitches, a feat of musical gymnastics well beyond the skill of most listeners. Where short and distinct musical phrases require such contortions just to show that they are musically related, there is no basis to find them substantially similar. *See Johnson*, 409 F.3d at 22; *see also Arnstein*, 82 F.2d at 277.

The harmonies accompanying Theme X also differ between "Got to Give It Up" and "Blurred Lines." Structurally, Theme X appears in completely different places in the two songs. In the deposit copy, it repeats several times in succession near the end of the piece. In "Blurred Lines," it is the very first line of verse near the beginning of the song and repeats periodically throughout the song.

## B.  Other Alleged Similarities

### 1.  Keyboard Parts

Finell testified that the keyboard parts in "Got to Give It Up" (meaning the chords and their rhythms played over the bass line) had "many important similarities" to those in "Blurred Lines." However, there are no keyboard parts in the deposit copy. Finell explained that a lead sheet is essentially "musical shorthand for musicians," who "would understand how [the keyboard parts are] to be played." But because "[a] sound is protected by copyright law only when it is 'fixed in a tangible medium,'" *Newton II*, 388 F.3d at 1194 (quoting 17 U.S.C. § 102(a)), the deposit copy's unwritten keyboard parts are not protected expression.

To the extent the chord indications sufficiently express the keyboard parts, there is no substantial similarity between the two works. "Blurred Lines" contains only two chords throughout the entire piece—an A chord and an E chord— that alternate every four measures. The deposit copy contains neither of these chords. The chords it does contain—A7, D7, E7, B7, Dm7, and Am7—change in a much more irregular pattern. For example, the first 16 measures have a sustained A7 harmony, and the next 8 measures change harmonies every measure.

### 2. Bass Line

Finell opined that the bass melodies in "Got to Give It Up" and "Blurred Lines" are similar. However, when comparing them, she showed the jury the version of the "Got to Give It Up" bass line that she had transcribed from the sound recording. Because several notes were different in the deposit copy, her testimony on this issue was of questionable value. *See Newton II*, 388 F.3d at 1196. It's also doubtful that the unexpressed portions of the baseline beyond the first eight measures of the deposit copy are sufficiently fixed in a tangible medium to warrant protection.

Even assuming the implied bass line in the deposit copy is sufficiently fixed, it's the type of expression that is so standard in the genre that it merges with the idea and is therefore unprotectable in and of itself. *Cf. Shapiro, Bernstein & Co. v. Miracle Record Co.*, 91 F. Supp. 473, 474 (N.D. Ill. 1950) (concluding that bass line was not copyrightable where it was "mechanical application of a simple harmonious chord"). Any thin protection that might lie in the "Got to Give It Up" bass line would not support a finding of substantial similarity between these two bass lines given their different notes, harmonies, and rhythms.



*Bass Line in "Got to Give It Up" (Deposit Copy)*



*Bass Line in "Blurred Lines"*

The only similarity between the bass lines is that they repeat the note A in most of the measures. However, in "Got

to Give It Up" the note is syncopated so that it sounds before the downbeat in the second, third, and fourth measures, whereas in "Blurred Lines" the note is played on the downbeat. Moreover, the note A is the root of the chord in each song (A7 in "Got to Give It Up," A in "Blurred Lines"). As the expert for Williams and Thicke testified without contradiction, it is commonplace for the root of a chord to appear in a bass line because it establishes the chord.

### 3. Word Painting, Parlando, and Lyrics

Word painting and parlando are common devices.[10] As Finnell acknowledged, word painting has "been used for many centuries," and parlando has been employed for "many years before . . . rap was used as an art form." The deposit copy's use of these techniques in the abstract is not protectable expression, and there is no evidence that the specific applications of these techniques in the two pieces are similar. To say these two songs are substantially similar because they employ devices common to songwriting would be like saying two songs are substantially similar because they both have guitar solos in the middle even though the solos themselves bear no resemblance. Similarly, lyrical themes about liberation and sexual activity are not protectable in the abstract. *See Edwards v. Raymond*, 22 F. Supp. 3d 293, 301 (S.D.N.Y. 2014) (citing *Feist*, 499 U.S. at 344–45); *see also Peters*, 692 F.3d at 636.

---

[10] Word painting is a compositional technique in which the music can be used to illustrate the words in the lyrics, such as setting the word "higher" to an ascending melody. Parlando is spoken word or rap in the middle of a song.

## C.  Overall Lack of Similarity

Even considering all of these individually unprotectable elements together, *see Metcalf*, 294 F.3d at 1074, there is no evidentiary basis to conclude that the two works are substantially similar.  *See Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1040 (5th Cir. 2015) (finding no similarity where "the alleged compositional similarities running between the songs in their entirety, *i.e.*, their melodies, rhythmic patterns, lyrical themes, and instrumental accompaniment, were either common to the . . . genre or common in other songs").

The two pieces have different structures.  Finell acknowledged that "Got to Give It Up" lacks a chorus whereas "Blurred Lines" has a "pretty common structure for a popular song" in that it consists of a verse, pre-chorus, and chorus.  The two songs' harmonies share no chords.

The discrete elements identified by Finell don't occur at the same time within the musical theme or phrase in each piece.  And with the exception of parlando, the various themes and phrases she identified don't occur in corresponding places in each piece.  Thus, whether considered micro- or macroscopically, "Got to Give It Up" and "Blurred Lines" are objectively dissimilar.  Williams and Thicke are entitled to judgment as a matter of law.

## IV.

The majority insists that the verdict is supported by the evidence but tellingly refuses to explain what that evidence is.  Instead, it defends its decision by arguing that a contrary result is impossible due to Williams and Thicke's purported procedural missteps.  Maj. Op. at 48–57.  While the

procedural mechanism for granting relief is beside the point given the majority's holding, there's no such obstacle here.

I agree that we normally are not at liberty to review the district court's denial of summary judgment after a full trial on the merits. *See Ortiz v. Jordan*, 562 U.S. 180 (2011). This rule makes eminent sense. Once a trial has concluded, any issues relating to the merits of the parties' dispute "should be determined by the trial record, not the pleadings nor the summary judgment record." *Id.* at 184 (quoting 15 Alan Charles Wright et al., *Federal Practice & Procedure* § 3914.10 (2d ed. 1992 & Supp. 2010)). However, there is little difference between reviewing a summary judgment ruling and a jury verdict other than the source of the factual record, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986), and here there are no material factual disputes. A completed trial does not prevent us from reviewing the denial of summary judgment "where the district court made an error of law that, if not made, would have required the district court to grant the motion." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).[11]

---

[11] The majority surprisingly questions whether *Escriba* "survives" *Ortiz*. Maj. Op. at 23–24. Since *Ortiz* expressly declined to decide whether there is an exception to the general rule for "'purely legal' issues capable of resolution 'with reference only to undisputed facts,'" 562 U.S. at 189, it didn't undermine our case law. Regardless, the majority isn't free to revisit circuit precedent absent intervening higher authority that is "clearly irreconcilable" with it. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Even if the majority were correct that this is a factual matter and Williams and Thicke's lack of a Rule 50(a) motion forfeited their right to challenge the evidentiary sufficiency—notwithstanding the district court's statement that it would not grant Rule 50(a) motions "by either side," *but see Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009) (leaving open possibility that

The majority conveniently ducks any review of the evidence by mischaracterizing the facts as "hotly disputed," Maj. Op. at 49, and accusing me of "act[ing] as judge, jury, and executioner," *id.* at 48, by "weigh[ing] the experts' credibility, resolv[ing] factual conflicts, and set[ting] forth [my] own findings on the extrinsic test," *id.* at 54. But my "musicological exegesis," *id.* at 49, concerns evidence of extrinsic similarity that *Finell* presented at trial. No one disputes that the two works share certain melodic snippets and other compositional elements that Finell identified. The only dispute regarding these similarities is their legal import—are the elements protectable, and are the similarities substantial enough to support liability for infringement? *See Mattel*, 616 F.3d at 914 ("We review de novo the district court's determination as to the scope of copyright protection." (citing *Ets-Hokin*, 225 F.3d at 1073)); *Benay*, 607 F.3d at 624 ("Substantial similarity is a fact-specific inquiry, but it '"may often be decided as a matter of law."'" (quoting *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006))).

By characterizing these questions as a factual dispute among experts, the majority lays bare its misconception about the purpose of expert testimony in music infringement

Rule 50(b) motion is not forfeited where district court instructs parties not to file Rule 50(a) motion); *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996) (citing district court's instruction "not to make the rule 50(a) motion" as "legitimate excuse" for not making one)—we can still review the sufficiency of the evidence for plain error. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007) (citing *Patel v. Penman*, 103 F.3d 868, 878 (9th Cir. 1996)) (contrasting Rule 50(b) motion as "absolute prerequisite" for appellate relief). A decision permitting entire genres of music to be held hostage to infringement suits is a "manifest miscarriage of justice," *Patel*, 103 F.3d at 878, warranting relief.

cases. As with any expert witness, a musicologist can't opine on legal conclusions, including the ultimate question here—substantial similarity. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); Michael Der Manuelian, Note, *The Role of the Expert Witness in Music Copyright Infringement Cases*, 57 Fordham L. Rev. 127, 138 (1988) ("[E]xpert analysis is not relevant to the determination of substantial similarity of expression of ideas."); *see also Swirsky*, 376 F.3d at 851 ("[A] musicologist is not an expert on what the term 'idea' means under the copyright laws."). Her role is to identify similarities between the two works, describe their nature, and explain whether they are "quantitatively or qualitatively significant in relation to the composition as a whole," *Newton II*, 388 F.3d at 1196. The value of such testimony is to assist jurors who are unfamiliar with musical notation in comparing two pieces of sheet music for extrinsic similarity in the same way that they would compare two textual works.

This result would never stand in copyright cases involving works in other media. We "frequently" conclude as a matter of law that two works of language or visual art fail the extrinsic test for substantial similarity. *Benay*, 607 F.3d at 624 (quoting Funky Films, 462 F.3d at 1077); *see, e.g.*, *Briggs v. Sony Pictures Entm't, Inc.*, 714 F. App'x 712 (9th Cir. 2018) (screenplays); *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018) (photograph); *Silas v. Home Box Office, Inc.*, 713 F. App'x 626 (9th Cir. 2018) (television show); *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768 (9th Cir. 2018) (drawing); *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618 (9th Cir. 2017) (advertising image and phrase); *Edwards v. Cinelou Films*, 696 F. App'x 270 (9th Cir. 2017) (film); *Heusey v. Emmerich*, 692 F. App'x 928 (9th Cir. 2017) (screenplay and film); *Braddock v. Jolie*, 691 F. App'x 318 (9th Cir. 2017) (novel and film); *Basile v.*

*Twentieth Century Fox Film Corp.*, 678 F. App'x 576 (9th Cir. 2017) (stories and film); *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062 (9th Cir. 2016) (video game), *cert. denied*, 138 S. Ct. 422 (2017); *see also Mattel*, 616 F.3d at 917–18 (vacating jury determination of substantial similarity between dolls).[12]  This case should be no different.

## V.

The Gayes, no doubt, are pleased by this outcome.  They shouldn't be.  They own copyrights in many musical works, each of which (including "Got to Give It Up") now potentially infringes the copyright of any famous song that preceded it.[13]

That is the consequence of the majority's uncritical deference to music experts.

Admittedly, it can be very challenging for judges untrained in music to parse two pieces of sheet music for extrinsic similarity.  But however difficult this exercise, we cannot simply defer to the conclusions of experts about the ultimate finding of substantial similarity.[14]  While experts

---

[12] In faulting my citation of unpublished cases, *see* Maj. Op. at 51–52, the majority misses the point.  That we choose not to publish many of our numerous cases deciding substantial similarity as a matter of law shows only how uncontroversial these decisions are when they concern non-musical works.

[13] "Happy Birthday to You" was still copyright protected when Marvin Gaye wrote Theme X.  *See Eldred*, 537 U.S. at 262 (2003) (Breyer, J., dissenting).

[14] Federal Rule of Evidence 706, which allows courts to appoint their own experts, may be useful in situations where the court has little

are invaluable in identifying and explaining elements that appear in both works, judges must still decide whether, as a matter of law, these elements collectively support a finding of substantial similarity.  Here, they don't, and the verdict should be vacated.

I respectfully dissent.

---

musical expertise and the parties' experts deliver starkly different assessments of two works' similarity.